THE SENECA NATION OF INDIANS, Appellant, *v.* HARRISON B. CHRISTIE, Respondent.

On the declaration of independence the colonies became sovereign states, and, as such, succeeded to the title of the crown to all the ungranted lands within their respective boundaries, with the exclusive right to extinguish by purchase the Indian titles, and to regulate dealings in regard thereto with the Indian tribes, which power they retained after the adoption of the Federal Constitution.

The United States could not impair their title or authorize any purchase of lands within a state without the consent of the state.

The provisions of the Constitution of the United States prohibiting any state from entering into "any treaty, alliance or confederation" (§ 10, art. 1), and conferring upon the president the treaty-making power (§ 2, subd. 2, art. 2), does not apply to negotiations or dealings between a state and Indian tribes therein for the extinguishment of the Indian title to land in the state.

Such a dealing is not a treaty in the constitutional sense, nor is it inconsistent with the exercise by the United States of its general jurisdiction for the protection of the Indians in their right of occupancy of their lands.

The section (12) of the act of congress of 1802, known as the "Indian Intercourse Act," which invalidates any purchase of lands from Indians unless "made by treaty or convention entered into pursuant to the Constitution," applies simply to purchases of Indian lands owned by the United States, for the sale of which its consent is indispensable.

The proviso in said provision making it "lawful for the agent or agents of any state, who may be present at a treaty held with Indians under the authority of the United States in the presence and with the approbation of the commissioner or commissioners of the United States appointed to hold the same, to propose and adjust with the Indians the compensation to be made for their claims to lands within such state which shall be extinguished by treaty," was intended to except from the scope of the first part of the section dealings with Indian tribes for the purchase of their right to lands within the state, of which the state owned the pre-emptive

title. It does not require that the treaty for that purpose shall be one between the United States and the tribe from whom the purchase is made; it is sufficient if the purchase is made at a treaty held "under the authority of the United States," and in the "presence and with the approbation" of its commissioner.

A state or its agent is authorized, therefore, to enter into a treaty or convention with the Indian tribe within its borders for the extinguishment of the Indian title, provided it is entered into in the presence of and with the approval of a commissioner of the United States appointed to attend the same, and such a treaty requires no ratification or proclamation by the Federal authorities.

Accordingly *held*, that the purchase made August 31, 1826, by certain individuals known as the Ogden Land Company of the Seneca Indian Nation, of their right to lands within this state, having been made at public council of that nation under authority of the state, in pursuance of the compact between it and Massachusetts, in the presence of and with the approval of commissioners of Massachusetts and of the United States designated for that purpose, and having been ratified by this state, was valid, and that the purchasers, on the execution of the deed to them of that date by the sachems, chiefs and warriors of said nation followed by voluntary surrender and abandonment by the Indian occupants of the land granted, acquired a valid title in fee simple absolute; that a treaty between the Federal Government and the Senecas was not necessary to give validity to the transaction; that assuming the said section of the "Indian Intercourse Act" applied to and regulated the manner of acquiring the Indian title to the lands embodied within said compact between Massachusetts and New York as to which, *quære,* that the purchase so made was not in violation of said section.

*It seems* that, conceding the invalidity of said grant under the act of 1802, the title was subsequently confirmed and validated by the act of congress of 1846, which authorized the president to receive the purchase-money for said land that had been held in trust for the Senecas, followed by the transfer of the fund to the United States; that the Federal Government which imposed the restriction could waive it and the receipt and administration of the fund as a trust fund for the benefit of the grantors established such waiver.

This was an action of ejectment brought under the act of 1845 (Chap. 150, Laws of 1845), authorizing such actions to be brought in certain cases in and by the name of "The Seneca Nation of Indians." The actions thereby authorized are required by the act to be brought "in the same time" as if brought by the citizens of the state. *Held,* that the Statute of Limitations was a bar; that plaintiff could not invoke the special remedy given by the act without being bound by the conditions upon which it was given.

The history given of the compact entered into between the states of New York and Massachusetts, and of the action of the Federal and State

Governments in reference to the extinguishment of the Indian titles to the land in New York, the right of pre-emption in which was by that compact ceded by New York to Massachusetts.

Reported below, 49 Hun, 524.

(Argued October 23, 1890 ; decided April 14, 1891.)

Appeal from judgment of the General Term of the Supreme Court in the fifth judicial department, entered upon an order made October 19, 1888, which affirmed a judgment in favor of defendant entered upon a verdict directed by the court.

The nature of the action and the facts, so far as material, are stated in the opinion.

*James C. Strong* for appellant. The plaintiff has a right to bring this action. (Laws of 1845, chap. 150, § 1 ; Code. Civ. Pro. § 419.) The plaintiff being a nation of Indians, the Statute of Limitations does not apply to or affect its right to bring this action. (*McGammon* v. *Straghtley,* 32 Kan. 524 ; 5 Pet. 4 ; 1 Dill. 349 ; 5 Wall. 761.) No title to Indian lands can be acquired by adverse possession or prescription. (2 U. S. Laws, 460, chap. 13 ; U. S. Const. art. 2, § 2 ; id. art. 1, § 8 ; R. S. §§ 88, 476 ; 5 Pet. 4 ; 7 U. S. Stat. at Large, 44, 47 ; 1 Paine. 457 ; 65 N. Y. 57, 66 ; 1 Dill. 349, 350 ; 5 Wall. 761, 768 ; 5 Lans. 397 ; 4 McLean, 440 ; 5 Wall. 737, 758 ; 3 Dill. 418.) Lands could not be purchased from Indians except by treaty, entered into and executed in pursuance of the provisions of the United States Constitution. (2 U. S. Laws, 460, chap. 13 ; U. S. Const. arts. 1, 2, §§ 2, 8.) The right of pre-emption under which this land could be purchased from the Indians was owned by the state of Massachusetts, and was not private property at the time that state adopted the Federal Constitution, and by its adoption the state bound itself by its provisions, one of which was that it would not purchase land from the Indians except under such laws and regulations as congress might enact, governing such purchases, and of course its grantees were governed and bound by its act. (1 U. S. Chart. & Const. 921–942.) Section 3 of the act of congress of 1846, which provides for the transfer of $43,050 from the Ontario County Bank into the United States

treasury (by reason of the expiration of the bank's charter) in
no way ratified the treaty of August 31, 1826, nor did it in any
manner affect the title to lands purported to be conveyed by it
(U. S. Stat. 1846, § 3; *Cox* v. *Mayor, etc.*, 103 N. Y. 519.)
The burden of proof in this case rests upon the defendant. It
devolves upon him to absolutely prove his title. (5 U. S.
Stat. at Large, 733, § 22.)

*Norris Morey* for respondent. This action is barred by the
Statute of Limitations. (*Cayuga Nation* v. *State*, 99 N. Y.
235; *Strong* v. *Waterman*, 11 Paige, 607; *Munro* v. *Merchant*,
28 N. Y. 10; *Sands* v. *Hughes*, 53 id. 296; *Bradstreet* v.
*Huntington*, 5 Pet. 402, 439, 448; *Ward* v. *Warren*, 82 N. Y.
265; *Nichols* v. *Wentworth*, 100 id. 455; *Harpending* v. *D.
Church*, 16 Pet. 455; *Humbert* v. *T. Church*, 24 Wend. 587.)
Unless persons are under the disabilities expressly mentioned
in the Statute of Limitations, they cannot be exempted from
its operation by judicial construction. The plain meaning and
literal expression of the Statute of Limitations is not to be
departed from by the courts. (Angell on Lim. §§ 194, 476;
*Demarest* v. *Winkoop*, 3 Johns. Ch. 129; *McIvor* v. *Ragan*,
2 Wheat. 25; *Harpending* v. *D. Church*, 16 Pet. 455, 493;
*Bogardus* v. *T. Church*, 4 Paige, 178; *Humbert* v. *T. Church*,
24 Wend. 587; *Green* v. *Niel*, 6 Pet. 291; *Mitchell* v. *United
States*, 9 id. 760; *Stone* v. *United States*, 2 Wall. 525.) The
claim made by the attorney for the plaintiff that the treaty or
conveyance of August 31, 1826, was absolitely void, and that,
therefore, the Ogden Land Company and its successive grantees,
including the defendant, have acquired no right whatever there-
under is untenable. (*Mitchell* v. *U. S.*, 9 Pet. 711; *Johnson*
v. *MacIntosh*, 8 Wheat. 543; *Fletcher* v. *Peck*, 6 Cranch.
142; *U. S.* v. *Cook*, 19 Wall. 591; *Busher* v. *Wetherby*, 95
U. S. 517; *Strong* v. *Waterman*, 11 Paige, 607.) The claim
that this conveyance of August 31, 1826, was invalid, under
the provisions of section 12, chapter 13, Laws of 1802 (2 Stat-
utes at Large, 143), because it was not ratified by a two-
thirds vote of the senate of the United States, is erroneous.

(*U. S.* v. *Kagama*, 118 U. S. 375, 380 ; U. S. Const. art. 2, § 2 ; U. S. Laws of 1796, chap. 30, § 12.) The purpose and legal effect of the act of congress was to prohibit any extin-·guishment of the Indian title to lands within the territories of the United States, except by a constitutional treaty, and to establish a federal supervision over the making of all contracts for the extinguishment of the Indian title to lands within the states. (*Mitchell* v. *U. S.*, 9 Pet. 711 ; 7 U. S. Stat. at Large, 601–603 ; *Stuart* v. *Laird*, 1 Cranch. 308 ; *Martin* v. *Hunter*, 1 Wheat. 304 ; *B. C. L. Co.* v. *Sarony*, 111 U. S. 53 ; *Pollock* v. *B. S. Co.*, 114 id. 411.) If the purchase by the holders of the right of pre-emption needed any recognition or confirmation from the government of the United States, it received such recognition and confirmation by section 3 of chapter 34 of the laws of congress of 1846. (*Holden* v. *Joy*, 84 U. S. 211.) The exclusive right to purchase these lands of the Indians had been theretofore secured to the state of Massachusetts and its grantees by the treaty of session between the states of New York and Massachusetts, which had been duly confirmed and adopted by the United States government. The United States government had, therefore, granted and confirmed to the Indians the right to sell and to the state of Massachusetts and its grantees (the Ogden Land Company whose title defendant has) the exclusive right to purchase. These rights, thus secured, could not be taken away by a mere act of congress. ( *Wilson* v. *Wall*, 6 Wall. 89 ; *Holden* v. *Joy*, 84 U. S. 211, 250 ; *Insurance Co.* v. *Cantor*, 1 Pet. 542 ; *Mitchell* v. *U. S.*, 9 id. 749 ; *Murray* v. *Wooden*, 1 Wend. 531 ; *Smith* v. *City of Rochester*, 92 N. Y. 476, 477 ; *United States* v. *Kagama*, 118 U. S. 375.) The title of the Indians to the soil is founded upon simple occupancy, and they have no power to dispose of the soil, except to the government, or one who has acquired from the government the right of pre-emption. The possession, when abandoned by the Indians, attaches itself to the fee without further grant. (*United States* v. *Cook*, 19 Wall. 591 ; *Jackson* v. *Hudson*, 3 Johns. 375 ; *Howard* v. *Moot*, 64 N. Y. 270 ; *Strong* v. *Waterman*,

11 Paige, 607; *Johnson* v. *MacIntosh*, 8 Wheat. 543; 3 Kent's Comm. 79, 80; *Bucher* v. *Wetherby*, 95 U. S. 517.)

ANDREWS, J.  This is an action of ejectment brought to recover one hundred acres of land in the county of Erie.

The general facts are undisputed.  The land in question is a part of a tract of more than 87,000 acres or 135 square miles of land situate in. Erie and other counties in the western part of the state, which prior to August 31, 1826, and for a period extending back to about the middle of the seventeenth century, had been in the occupation of the Seneca Nation of Indians, claiming dominion by conquest from other aboriginal tribes.

On the day mentioned (August 31, 1826), at a public council of the Seneca Nation held at Buffalo Creek, in the county of Erie, a deed was executed by the Indians to Robert Troup, Thomas L. Ogden and Benjamin W. Rogers (known as the Ogden Land Company), of the 87,000 acres of land to which reference has been made, situated in Erie, Cattaraugus, Allegany, Livingston, Genesee and Chatauqua counties, in this state. The deed contains a recital that it was executed " at a treaty held under the authority of the United States at Buffalo Creek, in the county of Erie, in the state of New York, between the sachems, chiefs and warriors of the Seneca Nation of Indians on behalf of said nation and Robert Troup, Thomas L. Ogden and Benjamin W. Rogers, Esq., of the city of New York, in the presence of Oliver Forward, Esq., commissioner appointed by the United States for holding said treaty, and of Nathaniel Gorham, Esq., superintendent on behalf of the state of Massachusetts."  It purports, in consideration of the sum of $48,216, acknowledged in the deed to have been in hand paid to the sachems, chiefs and warriors of the Seneca Nation by the grantees, to grant to the purchasers all the right, title and interest of the Seneca Nation in and to the lands described, and was executed under the hands and seals of the sachems, chiefs and warriors (forty-six in number) of the Seneca Nation and of the several grantees on the deed, and is witnessed by

Jasper Parish, Indian agent, and three other persons described as interpreters. It was certified and approved by the superintendent appointed on behalf of the state of Massachusetts, and by Oliver Forward, the commissioner of the United States. It is stated in the certificate of the United States commissioner that the deed was executed in his presence by the sachems, chiefs and warriors of the Seneca Nation, and was fully understood by them, who declared that it was "done to their universal satisfaction." The deed was proved by one of the subscribing witnesses, was afterwards confirmed by the legislature of Massachusetts and, in 1827, was duly recorded in the several counties in this state in which the lands were situated. In 1827 the sum of $43,050 of the consideration of the deed was deposited by the grantees in the Ontario Bank of Canandaigua, in trust for the Seneca Nation, where it remained from that time until 1855, when it was paid over by the bank into the United States treasury, where it still remains. Meanwhile, from 1827 to the time of the commencement of this suit, a period of nearly sixty years, the interest on this fund has been annually paid to the Seneca Nation, first by the bank and afterwards by the United States. It does not appear how or when the remainder of the consideration mentioned in the deed was paid, or whether it was paid at all, except as may be inferred from the acknowledgment of payment of the consideration in full, contained in the deed.

The conveyance or treaty of August 31, 1826, was never ratified by the senate of the United States, or proclaimed by the president. The extent of the participation of the United States in the transaction may be briefly stated. By the ordinance of August, 1786, the department of Indian affairs was placed under the control of the war department. May 23, 1826, the then secretary of war of the United States, in a letter of that date, directed to "Oliver Forward, Commissioner," after stating that application had been made to the department "by the proprietors of the pre-emption right to certain lands held by Indians in the state of New York for the sanction of the government to treat with them for the

extinguishment of their right to the occupancy of the same, and it being deemed proper that the United States, as the general protector of the Indian tribes, should be present by their commissioner at the treaty which the proprietors propose to hold during the ensuing summer with said Indians for this object," informed Mr. Forward that he had been selected by the president for the performance of this duty.    The letter proceeded : " You are accordingly requested to correspond with the proprietors and to attend the treaty at such time as may be fixed on by them for holding it, to see that all the proceedings are just and fair.    Whatever may be done must be done with the free consent of the Indians.    You will, however, exercise a sound discretion in the business, and if satisfied with the fairness of the propositions of the proprietors, will afford them such co-operation in effecting them as you may judge proper." On the 24th of February, 1827, the president of the United States transmitted to the United States senate a copy of the treaty or conveyance of August 31, 1826, together with other papers, including a report from Thomas L. McKenny, superintendent of Indian affairs, relating to said treaty, made to the secretary of war under date of February 16, 1827.    In this report the superintendent stated that "in pursuance of law and usage, an agent in the person of Oliver Forward was appointed to represent the United States under instructions from the Department of War, and to sanction, in behalf of the United States, the proceedings under said treaty.    This trust has been executed."    The report then referred to the provisions of section 12 of the Indian intercourse law of 1802, and, after quoting the language of the proviso in that section, said : " In conclusion, those treaties hitherto made under such circumstances were submitted to the Senate, except the treaty with the Senecas of the 3d of September, 1823, executed in presence of Charles Carroll, Commissioner on the part of the United States. . It was deemed a useless ceremony, the president approving it only."    The treaty of September 3, 1823, referred to in the report, was a conveyance substantially like the one in question.    (Indian Treaties, 1837, pg. 305.)

The senate, on receiving the communication from the president, referred the "treaty with the Seneca Indians" to the committee on Indian affairs, and afterwards on its being reported back to the senate, that body refused to ratify it, but the senate passed an explanatory resolution as follows: "*Resolved*, That by the refusal of the Senate to ratify the treaty with the Seneca Indians, it is not intended to express any disapprobation of the terms of the contract entered into by the individuals who are parties to that contract, but merely to disclaim any power over the subject-matter." No further action has been taken by the United States, except that in 1855, in pursuance of the 3d section of the act of congress, approved June 27, 1846, which authorized the president to receive from the Ontario Bank any public stocks or moneys which said bank might hold in trust for the Seneca Indians, the fund of $43,050, above mentioned, was transferred to the United States treasury, and thereafter, as has been stated, interest thereon has been paid annually to the Seneca Indians by the United States.

It is among the agreed facts of the case that soon after the execution of the deed of August 31, 1826, Troup, Ogden and Rogers entered into full and exclusive possession of the lands embraced in the grant, with the consent of the Seneca Nation; that in or about the year 1828, a boundary line between the lands conveyed and the remaining lands of the Seneca Nation, was surveyed and plainly marked and blazed, which has ever since been recognized by the plaintiff and the successive grantees of Troup, Ogden and Rogers; that the lands embraced in the grant have been subdivided and sold to purchasers, and that extensive and valuable improvements have been made thereon in reliance upon the title under the grant of August 31, 1826. Indeed, it is matter of common history that the lands have become the sites of flourishing towns and villages and cultivated farms, and are now the abode of thousands of people pursuing the avocations of civilized life.

There are certain facts antedating the transaction of August 31, 1826, which have an important bearing upon the question in

this case.   The compact entered into between the states of New
York and Massachusetts on the 16th of December, 1786, was
the settlement of a controversy which had arisen between the
colonies of New York and Massachusetts, which was pending
at the time of the Revolution, respecting the right of sov-
ereignty and jurisdiction over a very large territory within the
chartered limits of the province of New York, but which was
claimed by Massachusetts to be included within the limits
of the earlier charter of the colony of Massachusetts Bay.
The dispute still unsettled was after the Articles of Confed-
eration, brought by Massachusetts to the attention of congress
by petition praying for the appointment of commissioners for
the settlement of its claim, in pursuance of the Articles of
Confederation, and congress was proceeding to appoint com-
missioners when further action on its part was arrested by the
appointment by voluntary agreement between the two states of
commissioners to adjust the controversy.    These commission-
ers, in behalf of their respective states, entered into the com-
pact referred to.   By this compact Massachusetts ceded to the
state of New York the right of government, sovereignty and
jurisdiction over the whole territory in dispute, and New York
ceded to Massachusetts the right of pre-emption of the soil and
to extinguish the Indian title to about 6,000,000 acres of land
in the western part of the state of New York, described in
the treaty, Massachusetts surrendering to New York all claim
to any other territory therein.   By the 9th article of the treaty,
Massachusetts was authorized to treat with the native Indians
for acquiring the right of soil in the territory thereby ceded to
Massachusetts.   The 10th article is as follows: "Tenthly.
The commonwealth of Massachusetts may grant the right of
pre-emption of the whole or any part of the said lands and
territories to any person or persons, who by virtue of such grant,
shall have good right to extinguish by purchase the claims of
the native Indians, providing, however, that no purchase from
the native Indians by any such grantees shall be valid, unless
the same shall be made in the presence of and approved by a
superintendent to be appointed for such purpose by the common-

wealth of Massachusetts, and having no interest in such purchase, and unless such purchase shall be confirmed by the commonwealth of Massachusetts." This compact, after the adoption of the Constitution of the United States and prior to the grant of August 31, 1826, was formally ratified and appoved by congress, whose consent was made necessary both by the Articles of Confederation and by the Federal Constitution to any compact between the states. In 1791 the state of Massachusetts conveyed its title and interest in and to about 5,000,000 acres of the lands ceded to it by the treaty of 1786, subject to the Indian right, to Robert Morris, of Philadelphia, who subsequently conveyed the greater portion to persons constituting the Holland Land Company, who afterwards, prior to 1826, conveyed the tract of· 98,000 acres embraced in the deed of the Seneca Indians of August 31, 1826, to Troup, Ogden and Rogers, the grantees in that deed. The ·pre-emption right to that part of the territory included in the cession to Massachusetts not embraced .in the conveyance to Morris in 1791 had, prior to that date and on July 4, 1788, been sold by that state to Oliver Phelps (known as the Phelps and Gorham purchase), being a large tract off the eastern side of the lands embraced in the compact of 1786.

It is material to observe that there was no uniform procedure on the part of the purchasers· from Massachusetts in acquiring the Indian title.

In 1788, at a council of the·Seneca Indians held at Buffalo Creek, which was attended by Mr. Phelps and by an agent of Massachusetts, a treaty was made by which the Indians conveyed to Phelps for a consideration agreed upon, the lands embraced in the Phelps and Gorham purchase. The United States was not represented at this treaty, nor was any agent specially appointed in behalf of New York present at its execution. Under this title all the lands embraced in that treaty are now held. The validity of this grant, made without the intervention of the state or federal authorities is impliedly recognized in the Pickering treaty between the United States and the Six Nations, proclaimed January 21,

1795, which, in defining the lands of the Senecas, commences the description: "Beginning on Lake Ontario at the north-west corner of the land they *sold to Oliver Phelps*," and that tract is not embraced in the description.    On the 15th of Sep, tember, 1797, at a public council of the Seneca Indians held at Geneva in the county of Ontario, the Indians conveyed to Robert Morris all the lands embraced in his purchase from Massachusetts, excepting certain Indian reservations, for the sum of $100,000.    It is recited in the conveyance that it was made " at a treaty held under the authority of the United States by the Honorable Jeremiah Wadsworth, a commissioner appointed by the president of the United States to hold the same," etc.    There was also present at this treaty a commissioner on the part of Massachusetts.    This treaty was between the Indians and Morris under the supervision of the commissioners named.    It was not a treaty between the United States and the Indians, at least no such treaty is found in the volume of Indian Treaties (7 U. S. St. at Large).    This grant is the origin of the title derived from the Indians to the lands known as the " Holland Purchase " and the " Morris Reserve " in this state.

The Indian grant to Troup, Ogden and Rogers of August 31, 1826, was the next large transaction for the extinguishment of the Indian title to lands embraced in the cession to Massachusetts.    The lands were part of the lands reserved by the Indians in the treaty with Morris of 1797.    The circumstances under which the grant of 1826 was made have already been stated.

Notwithstanding those grants to Phelps, Morris and Troup, Ogden and Rogers, there were still left in the possession of the Senecas several large reservations to which the Indian title had not been extinguished.    By treaties entered into between the United States and the Six Nations of January 15, 1838, and between the United States and the Seneca Nation of May 20, 1842, and the grants contemporaneously made, the right of the Seneca Nation to all the reservations excepting two was conveyed to the grantees, who were also the holders of the right of pre-emption under the Massachusetts title.

The United States was not a mere formal party to the treaties of 1838 and 1842. They contained stipulations relating to the removal of the Senecas to lands in the west, and the United States incurred obligations which made it a necessary party to the treaties. It is, however, worthy of observation that Ogden and Fellows, the assignees of the pre-emptive title of Massachusetts and to whom the Senecas at the treaty of 1838 granted their remaining lands, did not take their title under any stipulation in the treaty, but by a deed contemporaneously executed by the Indians directly to them. The treaty simply recites the fact that at the making of the treaty Ogden and Fellows, the assignees of Massachusetts, had purchased the lands of the Senecas in the presence and with the approbation of the United States commissioner.

By the successive transactions to which reference has been made, nearly all the lands of the Senecas, orignially embracing all the territory west of Seneca lake, within this state, have been purchased from them and all that is retained by the Senecas of their original possessions is a comparatively small territory, now the home of the remnant of this once powerful tribe.

It is the contention in behalf of the plaintiff that the grant to Troup, Ogden and Rogers, of August 31, 1826, was void and wholly ineffectual to extinguish the Indian title to the lands which it purported to grant. It is conceded that the grant was made at a public council of the Seneca Nation; that it was duly executed by the sachems, chiefs and warriors in pursuance of a purchase openly and fairly made, and without fraud; that the grantees held and owned the exclusive right to extinguish the Indian title to the lands granted, as assignees of the rights of Massachusetts under the compact of 1786; that the negotiation for the purchase was made and concluded and the deed executed in the presence of a commissioner of the United States and of a commissioner of the State of Massachusetts, and that the sale was afterwards duly confirmed by the legislature of that state, as provided in the compact; that at least $43,050 of the consideration agreed upon was paid by the purchasers and received by the Seneca Nation; that the deed was

duly recorded and that the lands embraced therein were there-after surrendered by the tribe to the grantees, the Indians abandoning the possession, and finally that for a period of more than half a century since the purchase was made the lands have been in the undisputed possession of the grantees in the deed and purchasers under them, claiming title under the grant, and without protest on the part of the state or Federal Government, or on the part of the Seneca Indians until at or about the time of the commencement of this litigation.

The claim of the plaintiff to undo this transaction and to be restored to the lands thus solemnly granted is based on two general propositions, First. That from the time of the adoption of the Constitution of the United States no valid purchase of Indian lands could be made, except under and in pursuance of a treaty between the United States and the tribe in occupation of the lands, entered into and executed under the treaty-making power conferred on the president and senate by that instrument; and, Second. That even if the mode of dealing with the Indians adopted in the present case was not, in the absence of any prohibitory legislation by congress, in contravention of the Constitution, nevertheless the purchase of August 31, 1826, was invalid for the reason that it was made in violation of the 12th section of the act of congress passed March 30, 1802, entitled "An act to regulate trade and intercourse with the Indian tribes and to preserve peace on the frontiers."

These claims challenge the title not only of every purchaser and holder of lands within the boundaries of the grant of August 31, 1826, but also the title to many millions of acres of lands in this state, held under Indian treaties made by the state of New York with the Indian tribes within its borders or under grants made by Indians to individuals under the authority of the state, where no treaty had been made between the United States and the Indian occupants.

The nature of the Indian title to lands on this continent was established by the system of public law adopted by European nations regulating their possessions here. It became the

recognized principle that discovery followed by possession vested in the sovereign by whose subjects the discovery was made the absolute title to the soil of the lands within the limits of the discovered territory, subject however to the right of occupation by the Indian tribes, which could only be extinguished by their voluntary consent, unless forfeited under the laws of war. It was a necessary sequence to the claim that the sovereign had the ultimate title to the soil, that the right to extinguish the Indian occupation was exclusively vested in the sovereign. The Indians were held to be incapable of alienating their lands except to the crown, and all purchases made from them without its consent, were regarded and treated as absolutely void. The title of the crown was subject to grant, but a grant from the crown only conveyed the fee subject to the right of Indian occupation and when that was extinguished under the sanction of the crown, the possession then attached to the fee and the title of the grantee was thereby perfected. These general principles were announced by Chief Justice MARSHALL in the great case of *Johnson* v. *M'Intosh* (8 Wheat. 543), which has ever since been regarded as a sound exposition of the nature of Indian titles.

The several colonial charters undertook to define the territorial limits of the respective colonies. In many cases the boundaries were indefinite and in some cases conflicting. The crown, however, except in case of proprietory charters, exercised the right of making grants of unappropriated lands within the chartered limits of the colonies, although the right of soil and jurisdiction was vested in the colonial governments. On the declaration of independence, the colonies became sovereign states. They were so acknowledged by the treaty of peace of 1783, and Great Britain by that treaty "relinquished all claims to the government, property and territorial rights" within the several colonies. It is the received opinion that the colonies succeeded to the title of the crown to all the ungranted lands within their respective boundaries, with the exclusive right to extinguish by purchase the Indian title, and to regulate dealings with the Indian tribes. "There was no

territory in the United States," said JOHNSON, J., in *Harcourt* v. *Gaillard* (12 Wheat. 523), " that was claimed in any other right than that of one of the confederated states; therefore, there could be no acquisition of territory made by the United States distinct from or independent of some one of the United States."

There was a controversy between the states and the United States as to the claim of the former to territory extending indefinitely westward, far beyond the limit of settlement, and whether the charters could be fairly construed to include these indefinite regions, which controversy, however, was happily compromised by cessions made by six of the states to the United States of territory claimed by them, commencing with that of New York, of March 1, 1781, and including the memorable cession of the northwestern territory by Virginia in 1784. (See *Clark* v. *Smith*, 13 Pet. 195; *Fletcher* v. *Peck*, 6 Cranch. 142.) This was the beginning of the acknowledged territorial possessions of the government of the United States, subsequently largely increased by purchases from France and Spain.

The original states, before and after the adoption of the Federal Constitution, assumed the right of entering into treaties with the Indian tribes for the extinguishment and acquisition of their title to lands within their respective jurisdictions. They exercised the power, which had before been vested in the crown, to treat with the Indians, and this they did independently of the government of the United States. This was notably true of the state of New York. Laws were enacted from time to time by the legislature of the state, authorizing treaties with the Indians. (See Laws of 1784, ch. 22; Laws of 1788, ch. 47; Laws of 1813, ch. 29, § 52; Laws of 1839, ch. 58; Laws of 1831, ch. 234.) In 1788, the state entered into treaties with the Onondagas and Oneidas, and in 1789 with the Cayugas, whereby it acquired the title to large tracts of land in the central part of the state, and many subsequent treaties were made with these tribes by which the state finally acquired nearly all their remaining lands. Similar treaties were made with the St. Regis, Mohawk and Seneca Indians. In all, more than thirty treaties were made between the state

and various tribes, independently and without the interven-
tion of the government of the United States. (See Collection
of State Treaties, Assembly Document, 1889, in Report on
Indian Problem.) They were generally negotiated by com-
missioners appointed by the legislature, acting in conjunction
with the governor of the state. It appears that on two or
three occasions a commissioner of the United States was pre-
sent when treaties were made. But in all cases the state and
not the United States was the contracting party with' the
Indians. The treaties were in no sense treaties made by the
president and senate of the United States. The list of gov--
ernors, who participated in making them, embraces many
of the great names in the history of the state. It includes
the Clintons, Tompkins, Van Buren, Marcy, Wright, Seward.
By virtue of these treaties this state entered upon the lands
acquired thereby, and they have been sold and built upon and
improved, and comprise some of the fairest and most pros-
perous districts of the state. It is evident that the eminent
statesmen who participated in' these negotiations, did not
understand that the prohibition in the Federal Constitution
that "no state shall enter into any treaty, alliance or con-
federation" (Art. 1, § 10), or the other provision vesting
the treaty-making power in the president and senate (Art. 2,
§ 2, subd. 2), prevented the state from negotiating with the
Indian tribes therein for the extinguishment of the Indian title.
It is worthy of observation that the Articles of Confederation:
also vested in Congress the exclusive power of entering into
treaties and alliances. (Art. IX.) The United States under
the Articles of Confederation and afterwards under the
Federal Constitution, assumed the position of protector of
the. Indian tribes. Concurrently with, and as a consequence
of the cessions made by the several states to the United States,
national interests were created in respect of the Indian lands,
of which the general government had become the proprietor.
In dealing with the Indians, the general government for a
long period treated the Indians as *quasi* independent nations.
Their position was anomalous. Their domestic affairs were

regulated to a great extent by the rules and usages of the several tribes, and they were regarded as possessing some of the characteristics of a distinct political community. Treaties were made with them from time to time by the United States. One of the earliest of these was the treaty of Fort Stanwix, made with the Six Nations on the 22d of December, 1784, which established the boundary between their lands and the lands ceded by the states to the United States. This was followed by the so-called Pickering treaty, between the same parties, of 1795, and by a large number of other treaties with Indian tribes throughout the United States.

It cannot, we suppose, be questioned that these treaties were constitutionally made in the exercise of the treaty-making power of the Federal Government, and became under the Constitution the supreme law. But the dealing by the general government with the Indian tribes through treaties was resorted to as a convenient mode of regulating Indian affairs, and not because, as with other nations, it was the only mode, independently of the arbitrament of war, of dealing with them. The policy of the general government in dealing with the Indians through treaties, and of regarding the Indian tribes as in some sense nations, which prevailed for nearly a century, has been radically changed by recent congressional legislation. The act of congress of March 3, 1871, prohibits further dealing with the Indian nations or tribes by treaties. It enacts that "no Indian nation or tribe within the territory of the Unted States shall be regarded or recognized as an independent nation, tribe or power, with whom the United States may contract by treaty." The act of congress of March 3, 1885, extending the jurisdiction of the United States courts over crimes committed by or against Indians on their reservations, and the act of February 8, 1887, providing for the holding of Indian lands in severalty by the members of certain tribes, indicate the same policy on the part of the general government to change the method of dealing with the Indians through treaties, and substituting therefor control through federal legislation.    (See *U. S.* v. *Kagama*, 118 U. S. 375.)

While the former policy prevailed, the making of treaties by the original states having the pre-emption title to the Indian lands within their limits, directly with the Indians, was not regarded by the general government as inconsistent with federal jurisdiction, or as in contravention of the provision in the Federal Constitution prohibiting a state from entering into " any treaty, alliance, or confederation." The state did not so regard it, as the numerous treaties made by it show. That the same view was taken by the general government appears from the Pickering treaty of 1795, which expressly recognized the validity of the treaties of 1788 and 1789, made between this state and the Oneida, Onondaga and Cayuga Nations. By the second article of that treaty " the United States acknowledged the lands reserved to the Oneida, Onondaga and Cayuga Nations in their respective treaties with the state of New York, and called their reservations, to be their property." The compact between New York and Massachusetts expressly authorizes Massachusetts or its grantees to treat with the native Indians for the purchase of their title to lands ceded ; and this compact was ratified by congress after the adoption of the Constitution. The practical construction given by the state of New York to the Federal Constitution, as shown by the numerous treaties made by it with the Indian tribes, and the recognition by the federal authority of their validity is very strong evidence that the clause in the Federal Constitution prohibiting the states from entering into treaties, does not preclude a state having the pre-emption right to Indian lands, from dealing with the Indian tribes directly, for the extinguishment of the Indian title. Such a dealing is not a treaty in the constitutional sense, and is not inconsistent with the exercise by the United States of its general jurisdiction for the protection of the Indians in their right of occupancy of their lands. The remark of Justice McLean, in his opinion in *Worcester* v. *State of Georgia* (6 Pet. 580), that "Under the Constitution no state can enter into any treaty, and it is believed that since its adoption no state under its own authority has held a treaty with the Indians," was true as referring to treaties for

lands owned by the general government, but if intended to have a broader scope, seems opposed to the facts of history. The circumstance that Gov. George Clinton, in 1793, after the passage of the Indian Intercourse Act of that year, transmitted to Mr. Jefferson, then secretary of state of the United States, exemplified copies of the different treaties entered into by the state of New York with the various tribes of Indians within its boarders, which treaties congress afterwards formally approved, does not militate against the view that the right of the state to enter into those treaties was not prohibited by the Constitution. The treaties had gone into effect and had been executed, and the act of Governor Clinton was a prudential measure to remove any possible cloud upon the action of the state.

As to the first contention made in behalf of the plaintiff, we are, therefore, of opinion that the state of New York had the power and right, under the Constitution, to make treaties with the Indian tribes within the state for the purchase of their lands, to which it held the pre-emptive right, and that the purchase of August 31, 1826, having been duly made under its authority in pursuance of the compact with Massachusetts of 1786, in the presence and with the approval of commissioners both of Massachusetts and of the United States, was valid, and that the purchasers on the execution of the deed of that date, followed by the voluntary surrender and abandonment by the Indian occupants of the land granted, acquired a lawful and valid title in fee simple absolute, and that a treaty between the United States and the Senecas was not necessary to give validity to the transaction.

The second general proposition asserted by the plaintiff, viz. : that the grant of August 31, 1826, was invalid under the 12th section of the Indian Intercourse Act of congress of 1802, remains to be considered. That section is as follows : " Sec. 12. And be it further enacted that no purchase, grant, lease, or other conveyance of lands, or any title or claim thereto, from any Indian, or nation or tribe of Indians, within the bounds of the United States, shall be of any validity in law or

·equity, unless the same shall be made by treaty or convention ·entered into pursuant to the Constitution ; and it shall be a misdemeanor in any person not employed under the authority of the United States to negotiate such treaty or convention, directly or indirectly, to treat with any such Indian, nation or tribe of Indians for the title or purchase of any lands by them held or claimed, punishable by fine not exceeding one thousand ·dollars and imprisonment not exceeding twelve months : *Pro-·vided, nevertheless,* that it shall be lawful for the agent or .agents of any state who may be present at a treaty held with .Indians, under the authority of the United States, in the presence and with ·the approbation of the commissioner or commissioners of the United States, appointed to hold the same, to propose to and adjust with the Indians the compensation to be made for their claims to lands within such state, which shall be extinguished by treaty."

By the 3d clause of section 8, tit. 1, of the Federal Constitution, power is given to congress, " to regulate commerce with foreign nations, and among the several states and with the Indian tribes," and the act of 1802 was passed in part execution of the authority. This clause in the Constitution is construed as extending the power of congress to the regulation of intercourse with Indian tribes residing within, as well as those residing without the limits of the states. (Sto. on Con. § 1100 ; Opinion of McLean, J., *Worcester* v. *State of Georgia, supra.)*

There is room for question whether the act of 1802, was intended to apply to treaties made· by a sovereign state with tribes within the state for the extinguishment of the Indian title to lands therein, or assuming that such treaties were as a general rule within the purview of the statute, whether the act was intended to apply to and regulate the manner. of acquiring the Indian title to lands embraced within the compact between Massachusetts and New York, which compact, afterwards ratified by congress, specifically authorized treaties to be made by Massachusetts with the Indians, and purchases to be made by the grantees of Massachusetts, subject only to the condition

that they should be made under the supervision of a commissioner of that state and confirmed by the legislature.

But assuming that the statute applies to the transaction of August 31, 1826, we are of opinion that the purchase then made was not in violation of the true meaning and effect of the 12th section. It is important to consider the circumstances then existing. The United States, by virtue of the cessions made by the states, was the owner of a large territory in possession of the Indian tribes, with the exclusive right of preemption. No state, nor foreign power, nor any company or individual could treat for or acquire the Indian title to such lands, except by the sanction and under the authority of the United States. The state of New York and the other states were at the same time owners of lands in the occupation of the Indian tribes within their respective limits, also having the exclusive power to extinguish the Indian title thereto. The United States could not impair the title of the states nor purchase the lands, nor authorize any purchase, without the consent of the state within which they were situated. Before the revolution the right to regulate trade with the Indians within the colonies was understood to belong to the prerogative of the crown (Sto. on Const. § 1099), and a license from the crown was necessary to enable individuals to purchase the Indian title, and purchases made with such license were valid. "It was," said BALDWIN, J., in *Mitchel* v. *U. S.* (9 Pet. 748), "the universal rule that purchases made at Indian treaties, in the presence and with the approbation of the officer under whose direction they were held by authority of the crown, gave a valid title to the lands; it prevailed under the laws of the states after the revolution, and yet continues in them where the right to the ultimate fee is owned by the states or the grantees. It has been adopted by the United States, and purchases made at treaties held by their authority have always been held good by the ratification of the treaty without any patent to the purchasers from the United States." From this practice in colonial times, that a representative of the crown should be present and approve purchases from the

Indians in order to make them valid, there naturally grew up the idea of federal supervision in these cases.

In the light of these circumstances the 12th section of the act of 1802 was enacted. The first part of the section invalidates any purchase of Indian lands except when made in pursuance of a constitutional treaty, that is, a treaty entered into between an Indian nation or tribe and the United States, by the president with the consent of the senate. This clause has a peculiarly appropriate application to purchases of Indian lands owned by the United States, for the sale of which its consent was indispensable. The proviso was intended to except from the sweeping scope of the first part of the section dealings with the Indian tribes for the purchase of their right to lands within the states, and of which the states owned the pre-emptive title. It was, therefore, provided that purchases in these cases might be made by the agents of any state present at any treaty held under the authority of the United States, in the presence and with the approbation of the United States commissioner appointed to hold the same. The purchase must be made at a treaty, as in other cases. This insures publicity and affords a protection against fraud. But the proviso does not require that the treaty should be one between the United States and the tribe from whom the purchase is made, as in the cases coming under the first clause of the section. It is sufficient if the purchase is made at a treaty held "under the authority of the United States," and in the "presence and with the approbation of the commissioner or commissioners of the United States," etc. The proviso would have little if any meaning, if construed as requiring a formal constitutional treaty in these cases, which were manifestly intended to be excepted from the operation of the primary clause.

The true spirit and intent of the proviso was, we think, to permit the state or its agents to enter into a treaty or convention with an Indian tribe within its borders for the purchase of a pre-emptive right, provided it was entered into in the presence of and with the approval of a commissioner of the United States appointed to attend the same, and that such a

treaty is within the true meaning of the proviso, a treaty held under the authority of the United States, and requires no ratification or proclamation by the federal authorities. The policy of the state of New York has been in full accord with that of the United States in prohibiting all private dealings with and purchases from Indians, except under the supervision of public officials and with the consent of the legislature. (Const. 1777, art. 37; Id. 1822, art. 7, § 12; Id. 1846, art. 1, § 16.)

The purpose of the proviso in the 12th section of the act of 1802, was to establish a federal supervision over contracts for the extinguishment of Indian title to lands within the several states, while in other cases such extinguishment was to be effected only by formal treaties between the United States and the Indian tribes. It is very significant of the construction of section 12 of the act of 1802, that the first Indian Intercourse Act of congress, passed July 22, 1790, declared that no sale of lands within the United States, made by any Indians, or nation, or tribe of Indians should be .valid to any person or persons, "or to any state, whether having the right of preemption or not," unless made at some public treaty, etc. The clause quoted was omitted in the next act of 1793, and a section was inserted with a proviso substantially like section 12 in the permanent act of 1802. This change indicates that it was the intention of congress to place purchases of Indian lands within the states upon a different footing than other purchases. ·

The purchase of August 31, 1826, was made in conformity with the compact between New York and Massachusetts. The commissioner of Massachusetts was present and approved the purchase, and it was sanctioned by the legislature of that state. The United States commissioner was also present. No agent of the state of New York, specially appointed as such, conducted the negotiations with the Indians. The state of New York accepted the result of the negotiation, by subjecting the lands to taxation and exercising full jurisdiction over the same from the time of the purchase. The state treated the purchase as though made by its authority, and the agent of

Massachusetts, in view of the compact of 1786, may properly be regarded as the agent of New York in the transaction, within the proviso of the act of 1802.   The federal authorities also treated the transaction as formal and regular, as is indicated by the action of the executive department of the United States government and of the senate of the United States. The secretary of war designated a commissioner to attend on behalf of the United States, at (as is stated in the commission) " a treaty which the proprietors propose to hold," etc.   The papers transmitted to the senate were accompanied by a communication from the department of Indian affairs, in which the opinion was expressed that the department regarded the transaction one which did not require the consent of the senate under the treaty-making power.   The senate accompanied its refusal to ratify it by a resolution which, while it recognized the transaction as a " treaty with the Seneca Indians," declared that in the judgment of the Senate "there was no necessity " for its interference.

Upon full consideration we are of opinion that the grant of August 21, 1826, was a valid transaction and was not in contravention of the provisions of the Federal Constitution or of the Indian Intercourse Act of 1802, and vested in the purchasers a good title in fee simple absolute to the lands granted, free from any claim of the Seneca Nation.

The affirmance of the judgment below might be placed on the narrower ground that, conceding the invalidity of the grant of August 31, 1826, under the Indian Intercourse Act of 1802, nevertheless the title was subsequently confirmed and made good by the act of congress of 1846, authorizing the president to receive from the Ontario bank, and deposit in the treasury of the United States, the money and securities representing the purchase-money of the lands, followed by the transfer of the fund to the United States in 1855.   The United States, which imposed the restriction, could waive it and give effect thereby to the intention of the parties to the grant, and the act of receiving the fund under a federal statute and administering it for many years as a trust fund for the benefit of the

plaintiffs, furnishes the most emphatic evidence of a ratification on its part, of the transaction from which the fund was derived.

We are also of opinion that as the right of the plaintiff to sue was given by and is dependent upon the statute, chapter 150 of the Laws of 1845 (See *Strong* v. *Waterman*, 11 Pai. 607), the Statute of Limitations is a bar to the action. By the act of 1845, the actions thereby authorized are to be brought and maintained " in the same time " as if brought by citizens of the state. The question is not whether an Indian title can be barred by adverse possession or by state statutes of limitation. The point is that the plaintiff cannot invoke the special remedy given by the statute without being bound by the conditions upon which it is given.

In view of the numerous Indian titles in this state, originating in treaties by the state or in purchases made with its sanction by individuals, we prefer to place our judgment on the broader ground, which will remove any cloud upon the validity of those titles.

As to the point that it does not affirmatively appear that the whole of the purchase-money was paid by Troup, Ogden and Rogers, it is sufficient to say that full payment is acknowledged in the deed, and that if this were not so, it would, under the circumstances, be presumed.

These views lead to an affirmance of the judgments below.

All concur.

Judgments affirmed.