THE SENECA NATION OF INDIANS, Appellant, *v.* WELLINGTON HUGABOOM, Respondent.

Courses and distances mentioned in a conveyance must yield to the lines as actually and duly made by survey and described by marks and monuments, and while a line is given as running between two points will be presumed to be a straight one, where a reference is made to a survey which shows the line not to be a straight one, it will control.

In an action of ejectment brought by plaintiff pursuant to the act of 1845 (Chap. 150, Laws of 1845), plaintiff claimed title under the treaty of 1802, between it and the Holland Land Company, and a deed executed in pursuance thereof, by which a portion of the south line of the lands reserved and released to said plaintiff is described as running west from a post a certain number of chains. The description closes with a statement that the lands described were to be held by plaintiff "in the same manner

and by the same tenor as the lands reserved " by plaintiff by a treaty or convention entered into September 15, 1797. The description also referred to a meridian line at the east line of the tract and to artificial monuments placed at the corners. Under the treaty of 1797 a survey of the lands was made and the line plainly marked; the meridian line referred to in the treaty of 1802 was located by and the monuments placed under that survey. If the south line was to be taken as a straight one between the two points given, the land in question would be included in the reservation, but it was not included by the south line as shown by the survey. It also appeared that the south line as defined by the marks and monuments had been treated and designated as the southern boundary from the earliest time within the memory of witnesses; that a fence had been erected upon it in 1829, which has since remained, and the lands south of it have been occupied by defendant and his predecessors in title. *Held*, that the evidence authorized the conclusion that the line as surveyed was the southern boundary of the reservation, and so sustained a verdict for defendant

Pursuant to an act of Congress of 1878 (Chap. 139), authorizing a re-survey of the reservation, a survey was made and duly approved; by this the south line in question was run as a straight line; plaintiff claimed under this survey. *Held*, that the survey so made did not, by changing the location of the line, have the effect to enlarge the reservation.

It was claimed on behalf of plaintiff that the Indians, being wards of the nation, could not be bound by practical location founded on acquiescence. *Held*, untenable; that as plaintiff's right to sue was given by and dependent upon the said act of 1845, which provides that actions "may be brought and maintained  *  *  *  in the same manner  *  *  *  as if brought by citizens of the state," in adopting the remedy, it was taken subject to the conditions.

(Argued March 23, 1892; decided April 26, 1892.)

APPEAL from judgment of the General Term of the Supreme Court, in the fifth judicial department, entered upon an order made March 25, 1890, which affirmed a judgment in favor of defendant, entered upon a verdict and also affirmed an order denying a motion for a new trial.

The nature of the action and the facts, so far as material, are stated in the opinion.

*Hudson Ansley* for appellant. The plaintiff is entitled to all the lands embraced in the treaty sanctioned by the government, to it. (*Marble* v. *McMinn*, 57 Barb. 610; *Fellows* v.

Opinion of the Court, per BRADLEY, J.

*Deniston*, 23 N. Y. 420.) The construction of the boundary line under this treaty must be determined from the instrument itself. (*Higginbotham* v. *Stoddard*, 9 Hun, 1; *Waugh* v. *Waugh*, 28 N. Y. 94; *Clark* v. *Beard*, 9 id. 183; *Rayner* v. *Timerson*, 46 Barb. 518; *Drew* v. *Smith*, 46 N. Y. 204; *White* v. *Williams*, 48 id. 344; *Hingsland* v. *Chittenden*, 6 Lans. 15; U. S. R. S. 2396, § 2; *Corning* v. *T. I. & N. Foundry*, 44 N. Y. 577; *People* v. *Dibble*, 16 id. 203.)

*W. S. Thrasher* for respondent. The original line as marked upon the land as and for the reservation boundary must control and determine the rights of the parties when found, whether it conforms to the verbal description of the treaty or not, and course, distance or map must give way to the marked line when that marked line is found. (*Van Wyck* v. *Wright*, 18 Wend. 157; *Jackson* v. *Freer*, 17 Johns. 29; *Wendell* v. *People*, 8 Wend. 190; *Rayner* v. *Timerson*, 46 Barb. 525; *Robinson* v. *Kime*, 70 N. Y. 154; *Newson* v. *Prior's Lessee*, 7 Wheat. 7, 8, 10; *Preston* v. *Bowman*, 6 id. 580; *Doe* v. *Thompson*, 5 Cow. 371.)

BRADLEY, J. The action is ejectment, and was brought in the name of the plaintiff, pursuant to statute. (L. 1845, ch. 150; 4 Edm. 375.)

It is alleged that the land in question is a part of the Cattaraugus Indian Reservation, by which the defendant's land is bounded on the north. The contest has relation to the location of the south line of the reservation. The plaintiff put in evidence a treaty made with the Seneca nation in 1797, and known as the Robert Morris treaty, also one of June 30, 1802. And it is insisted that by the latter, which describes the lines of the reservation, it is established that the defendant has in his possession a strip something over two chains in width of the plaintiff's land. The defendant's contention is to the contrary, and the determination of the question was at the trial made dependent upon the fact whether the south line in question was straight or was governed by a line not entirely so, which

had been run prior to the treaty of 1802. By the treaty of 1797 with Robert Morris and the deed then made pursuant to it by the sachems, chiefs and warriors of the Seneca nation the Indian title to a large portion of land commonly known as the Holland Land Company purchase was extinguished, and certain lands were reserved and excepted from the grant. The Holland Land Company having purchased the land and taken the right of pre-emption from Robert Morris, caused in 1798 a survey of the reservation in question to be made and the lines of its boundaries to be made and described, in 1802 made a treaty with that nation of Indians, and pursuant to it a deed was then made by and between the parties to such treaty whereby the Seneca nation exchanged with the Holland Land Company certain lands reserved by the treaty of 1797, and that company, by its representatives in consideration thereof (reserving the right of pre-emption) exchanged, ceded and released to the nation the land embracing the reservation in question, which was bounded and described as follows : " Beginning at a post marked No. 0, standing on the bank of Lake Erie, at the mouth of Cattaraugus creek, and on the north bank thereof; thence along the shore of said lake N. 11 degrees, E. 21 chains; N. 13 degrees, E. 45 chains; N. 19 degrees East, 14 chains, 65 links to a post ; thence East one hundred and nineteen chains to a post ; thence south fourteen chains, twenty-seven links to a post; thence east six hundred and forty chains to a post standing in the meridian between the 8th and 9th ranges; thence along said meridian south six hundred and seventeen chains, seventy-five links to a post standing on the south bank of Cattaraugus creek ; thence west one hundred and sixty chains to a post ; thence north two hundred and ninety chains, twenty-five links to a post; thence west four hundred and eighty-two chains, thirty-one links to a post ; thence north two hundred and nineteen chains, fifty links to a post standing on the north bank of Cattaraugus creek; thence down the same, and along the several meanders thereof to the place of beginning, to hold to the said parties of the first part " (the Seneca nation of Indians) " in the same manner and by the same tenor

as the lands reserved by the said parties of the first part in and by said treaty or convention entered into on Genesee river the fifteenth day of September, 1797."

The south line in question of the reservation is that above described as "thence west four hundred and eighty-two chains, thirty-one links to a post." Each of those treaties was conducted, on the part of the Seneca nation, by a commissioner duly appointed for the purpose. There is no dispute about the location of the corner at the east end of that line, nor substantially any about that at its west end.

The survey represented the boundary lines quite definitely by reference to distances with pointers and by witnesses to corners, and by it the line in question there mentioned as "thence west on said sixth parallel six miles, two chains and thirty-one links," was in that manner described with particularity.

The defendant relies upon the line as located by the Holland Land Company. And the plaintiff depends upon the line as surveyed in 1878 pursuant to the act of congress of May 25, 1878 (Ch. 139), entitled "An act to authorize the survey of the Cattaraugus Indian reservation of the state of New York," which authorized the secretary of the interior to cause the reservation "to be resurveyed in accordance with the original survey thereof and the exterior boundaries thereof to be marked by stone or iron monuments" at the expense of the Seneca Nation of Indians, who were authorized to select a surveyor to be approved by the secretary of the interior, who was authorized to pay the surveyor out of moneys under his control belonging to the nation of Indians. And it was further provided that the surveyor should make plats of the reservation showing the lines of the exterior boundaries, etc., to be submitted to the commissioner of the general land office for examination and approval. There was also a general statute on the subject, which provided that "whenever it becomes necessary to survey any Indian or other reservation or any lands, the same shall be surveyed under the direction and control of the general land office and as nearly as may be in con-

formity to the rules and regulations under which other public lands are surveyed." (U. S. R. S. § 2115.) The surveyor was selected, he made a survey which was duly approved, and by it he treated the south line as straight and so ran it. This line so run and located included in that north of it a strip upwards of eight rods in width of the land occupied by the defendant as part of his farm. The line as described in the treaty would, if nothing appeared to the contrary, be presumed· to be a straight one between its two terminal points. (*Kingsland* v. *Chittenden*, 6 Lans. 15.) And such is the statutory direction for making surveys of public lands when the boundary lines have not before been actually run and marked. (U. S. R. S. § 2396.) This rule would necessarily be applicable to the line in question if it had not been actually located by the previous survey. And if it had, the survey made upon the statutory direction or authority before mentioned could not have the effect to enlarge the reservation by change in the location of the line.

The proposition is too well settled to require any reference to authorities on the subject, that courses and distances mentioned in conveyances must yeild to the lines as actually and duly made by survey and described by marks and monuments of land conveyed. It is, however, said that there was not nor could have been any line adopted by practical location founded upon acquiesence, because the Indians being wards of the government could not in that manner be charged with accepting it as such. That is true, and the line was not at the trial treated as in that manner established. But in *Seneca Nation* v. *Christie* (126 N. Y. 122) the court expressed the opinion that as the right of the plaintiff to sue was given by and dependent upon the statute (L. 1845, ch. 150) which provided that actions might so " be brought and maintained  *  *  * in the same manner and within the same time as if brought by citizens of the state," the Statute of Limitations was a bar to an action thus brought. And this was put upon the ground that in adopting the remedy given by the statute it is taken subject

to the conditions there mentioned. It was fairly inferable that the line was run in 1798 in view of a treaty to be afterwards made and which was had in 1802. The line was plainly marked. And while the treaty did not, in terms, refer to the survey, it did refer to and mention lines which had been the result of a survey, and especially so in respect to the eastern terminus of the north line as at a post standing on the meridian between the 8th and 9th ranges, and thence south along such meridian. It thus appeared by the treaty that a meridian line had before then been located, and designated as the east line of the tract, and that artificial monuments had been placed at the corners. This evidently was done by the survey of 1798. And this was sufficient reference in the treaty to the survey to justify the inference that it, as made, described the lines of boundaries of the reservation. Inasmuch as it so appeared, the lines as actually made by the survey properly might control in that respect. There was evidence tending to prove the location of this south line as then surveyed, run and marked. And as thus it was represented by the old field notes giving not only the details as to distances, with pointers and witnesses, but also topography. Furthermore, it appears that this line so marked, has been treated and designated as the southern boundary of this portion of the reservation from the earliest time within the memory of witnesses. Then it was plainly defined by the marks and monuments of the surveyor, and as early as 1829 a fence was erected on it as the north line of land adjoining the reservation on the south, and fence has since remained there, and from that time the premises in question south of the fence have been occupied by defendant and those under whom he claims title. The line was recently before the trial traced by a surveyor and the marks of the line of 1798 sufficiently found to enable him to do so. The evidence was sufficient to permit the conclusion that this line was the southern boundary of the reservation mentioned in the treaty of 1802; and, therefore, the exceptions founded upon the proposition that it was otherwise, as matter of law, were not well taken.

The question whether the plaintiff was entitled to the possession of any land occupied by the defendant south of that line was treated by the court as one of fact and was submitted to the jury. They found for the defendant. There was no error.

The judgment should be affirmed.

All concur.

Judgment affirmed.