the state harmless against claims which may come against the state or its officers, but because of the direct wrong done by the defendant to the plaintiff. The defendant had no more right to obstruct and make impassable the towpath than any one else, except so far as it was necessary or permissible in carrying out its contract with the state in doing the work. The towpath was not closed to travel, and not the least precaution was taken to guard against the dangerous condition.

Counsel on either side have cited many decisions, but it does not seem necessary to analyze or comment upon them. I think none is at variance with the views expressed, but quite in harmony therewith. The latest case to which attention is called is that of Huntley v. Empire Engineering Corporation (D. C.) 189 Fed. 516, recently decided by Judge Hazel, where this same defendant was held liable for leaving a submerged obstruction in the canal. Judge Hazel cites various cases in the Court of Appeals to sustain his decision, and I think they also support the conclusion reached here.

None of the other grounds urged for reversal requires discussion.

The judgment and order should be affirmed, with costs. All concur.

PEOPLE ex rel. CAYUGA NATION et al. v. COMMISSIONERS OF LAND OFFICE.

(Supreme Court, Special Term, Albany County. October 28, 1911.)

1. STATES (§ 119*)—GIFT FROM STATE FUNDS—LEGISLATIVE POWERS.

The Legislature has the power to make a charitable gift from state funds where equitable, though a state official cannot pass a claim as a legal obligation which rests entirely upon equities.

[Ed. Note.—For other cases, see States, Cent. Dig. § 118; Dec. Dig. § 119.*]

2. INDIANS (§ 10*)—LAND—EFFECT OF TITLE.

The discovery of land held by the Indians, followed by possession, vested in the sovereign of the discovering subjects the absolute title to the soil subject to the Indians' right of occupation, which right could only be extinguished by their voluntary consent unless forfeited by the laws of war, and such sovereign had the exclusive right to extinguish their right of occupation, and the right of occupation of the Cayuga Nation was extinguished by their sale to the state in 1795 of their lands for a price agreed upon between the state and tribe, so that the tribe has no legal claim against the state for an amount based upon the difference between the price paid to it and the amount for which the state subsequently sold the lands.

[Ed. Note.—For other cases, see Indians, Cent. Dig. § 25; Dec. Dig. § 10.*]

3. MANDAMUS (§ 71*)—SUBJECTS OF RELIEF—OFFICIAL ACTS—NATURE.

Where the law requires a public officer to do a specified act in a certain manner without the exercise of any discretion, the duty is ministerial, and its performance may be compelled by mandamus in the absence of other remedy; but, where the law requires a judicial determination or the exercise of discretion in deciding whether an act should be done,

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

the duty is judicial, and mandamus will not lie to compel its perform-ance.

[Ed. Note.—For other cases, see Mandamus, Cent. Dig. § 133; Dec. Dig. § 71.*]

4. STATES (§ 180*)—CLAIM AGAINST STATE—SETTLEMENT.

The Legislature had power to enact Laws 1909, c. 255, requiring the Commissioners of the Land Office to make a fair and reasonable effort to negotiate with the Cayuga Nation of Indians an adjustment of their claims against the state for land sold by the state, and providing that if an agreement for the settlement of the claim was reached the commis-sioners should make a contract to that effect with the Indians, though the Court of Claims could have been given jurisdiction of the matter had the Legislature desired to do so.

[Ed. Note.—For other cases, see States, Cent. Dig. § 168; Dec. Dig. § 180.*]

5. MANDAMUS (§ 81*)—SUBJECTS OF RELIEF—OFFICIAL ACTS—PERFORMANCE OF DISCRETIONARY DUTIES.

Laws 1909, c. 255, requires the Commissioners of the Land Office to make a fair and reasonable effort to negotiate with the Cayuga Nation of Indians an adjustment of the claim of the Indians against the state, embodied in a certain memorial, and provides that if an agreement for the settlement of the claim is reached the commissioners shall enter into a contract with such Indians. *Held*, that a writ of mandamus would not be issued to compel the commissioners to make a reasonable effort to ne-gotiate with the Indian nation, etc., as provided by the statute, since such negotiations might be futile because of the failure of the Indians to consent to the proposal of the commissioners.

[Ed. Note.—For other cases, see Mandamus, Cent. Dig. §§ 138, 139; Dec. Dig. § 81.*]

Application by the People of the State of New York, on the rela-tion of the Cayuga Nation of Indians, resident in the City of New York, of Adelbert Moot and others, the Chiefs and Members of said Cayuga Nation of Indians, against the Commissioners of the Land Office, for a writ of mandamus. Application denied.

John Van Voorhis' Sons (Charles Van Voorhis, of counsel), for re-lators.

Thomas Carmody, Atty. Gen., for Commissioners of Land Office.

RUDD, J. This is a motion for an order directing the issuance of a peremptory writ of mandamus directed to the Commissioners of the Land Office, requiring them to meet and comply with the provi-sions of chapter 255 of the Laws of 1909, by making a fair and rea-sonable effort to negotiate with the said Cayuga Nation of Indians resident in the state of New York an adjustment of the claim em-bodied in the memorial of the said nation bearing date February 27, 1906, and that, if an agreement for the settlement of said claim is reached, then that said commissioners enter into a contract in behalf of the state of New York with the said nation to carry out said agree-ment, and to render the same effectual, as the said commissioners are empowered and directed, and as said chapter 255 of the Laws of 1909 intended said commissioners to do.

The history of the transactions out of which the alleged claim of the Cayuga Nation of Indians against the state arises is interesting.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

The Cayuga Indians at the close of the Revolutionary War were in possession of a large tract of land in the central part of the state. During that war the Cayuga Indians had been hostile to the Colonies and had borne arms in favor of Great Britain. In 1783 the Congress recommended a friendly treaty with the Indians, and in October, 1784 (Act Oct. 22, 1784, 7 Stat. 15), a treaty of peace was made at Ft. Stanwix between the United States and the warriors of the Six Nations, of which the Cayuga Indians were a part. By this treaty it was provided, among other things, that the Six Nations should be secured in the peaceable possession of the country lying east of a line running through Buffalo creek on Lake Erie to the Pennsylvania line.

In 1786 a treaty was concluded between New York and Massachusetts, by which certain lands were ceded to New York state, including the lands of the Cayuga Indians.

The first treaty made between the state of New York and the Cayugas was entered into by Gov. George Clinton and other commissioners, in February, 1789. By this treaty the Indians granted all of their lands to the people of the state of New York, holding, however, to themselves and their posterity, for their own use and cultivation, but not to be sold, leased, or in any other manner aliened, a certain tract of land.

In 1794 the Cayuga Indians petitioned Gov. Clinton that the state should purchase additional lands for them. This request resulted in an act of the Legislature (chapter 70 of the Laws of 1795) under which certain commissioners were appointed, in which legislative act the value of the Indians' interest in these lands was fixed at four shillings per acre. Under that act in July, 1795, the commissioners appointed met the representatives of the Cayuga Nation, and a treaty was entered into under and by which certain of the Cayuga lands were sold to the state at four shillings per acre. This treaty provided for the payment to the Indians of a certain sum, with annuities, which have been paid from that time to this.

The memorial of the Cayuga Indians filed with the Commissioners of the Land Office alleges that shortly after the treaty of 1795 the state disposed of the lands purchased from the Indians under the treaty, and realized therefrom, over and above the amount paid the Indian Nation, the sum of $247,609.33. The claim of the Indians against the state is for that amount, with interest.

The theory in brief of the claimant is that the state, in dealing by treaty with the Cayuga Indians, was dealing with its ward, and that the state, as the guardian, should not realize a profit to itself by the purchase and sale of its ward's property. The claim now pending arose, therefore, about 116 years ago.

The Assembly and Senate Journals from 1795 down contain frequent references to this matter.

The claim of the Cayuga Indians for profits on the sale of their lands by the state was originally presented to the Legislature March 16, 1853.

The claim was again presented to the Legislature in 1861. A legislative bill was introduced but not acted upon. In 1890 and 1891

bills were introduced in the Senate providing that the Cayugas should
no longer be treated as a nation or tribe, and appropriated money to
be divided among the Cayuga Indians residing not only in this state,
but also in Canada and the Indian Territory.   These bills failed.

In 1895 a bill was introduced to confer jurisdiction on the Court
of Claims to hear and determine the claim of the Cayuga Indians
against the state.   This bill failed.

In 1905 a Senate bill was introduced providing for an appropriation
of $36,400 "in consideration of profits accruing to the people of the
state in the purchase and sale of lands heretofore belonging to the
Cayuga Tribe of Indians."

In 1906 the last memorial on behalf of the Indians was presented
to the Commissioners of the Land Office.   The prayer of the me-
morial alleges that the Cayuga Nation has been and now is a ward of
the state, and has been and now is under the dependence and pupilage
of the state sovereignty; that the state is accountable, as guardian,
for the profits accruing to the state from the sale of the Indian lands;
that the petitioner is composed of the descendants of the ancient
Cayuga Nation reckoned according to its laws of descent; and that
the amount of the profits which accrued to the state from the sale
of the lands should be paid, or the indebtedness acknowledged by the
state.

In 1906 the Attorney General held that the Commissioners of the
Land Office were without jurisdiction to entertain the memorial until
the hearing of the same should first have been approved by the Gov-
ernor.

A bill was introduced in the Legislature of 1906 authorizing the
commissioners to hear the memorial.   This bill was vetoed by Gov.
Higgins.

In 1907 such a law was enacted (Laws 1907, c. 492), and the me-
morial was presented to the Commissioners of the Land Office in June,
1907.   Hearings were had, and all the proof was taken by documen-
tary evidence.

The subcommittee of the Commissioners of the Land Office re-
ported to the board in March, 1908, that inasmuch as the questions
presented involved the construction of authorities, acts of the Legis-
lature, and the legal status of the Cayuga Indians and their relation
to the state, and "inasmuch as we believe these Indians to be entitled
to some charitable relief at the hand of the state, we recommend that
the claim be referred to a special committee of the Legislature."

Subsequently, in April, 1908, Joseph A. Lawson, Esq., was ap-
pointed an agent of the board, to examine into the matter and report
in writing the facts as he found them.   In his report Mr. Lawson
found:

"That the Cayuga Nation of Indians resident in the state of New York,
the petitioner herein, has no claim to the said sum of $247,609.33, alleged to
be the profits accruing to the state of New York upon the purchase of the
lands from said nation by said state as set forth in the memorial herein, en-
forceable at law or in equity in any of the tribunals of this state, and that
said sum of $247,609.33 is in no sense a measure of damages sustained by
said Cayuga Nation by reason of said purchase and sale as aforesaid."

Mr. Lawson further reported that in view of the fact that the Cayuga Indians have not been allotted a reservation of lands, and that said nation is without an abiding place in this state except by the sufferance of the Seneca Nation of Indians, with whom they reside, he advises that:

"There rests a moral obligation upon the people of the state of New York to make further provision for the support and maintenance of said Cayuga Nation, based upon the consideration of and with reference to said sum of $247,609.33 as the profits realized by the state from the sale of lands heretofore belonging to said nation and made possible by reason of the superior knowledge, ability, and position of said state in its negotiations with said Cayuga Nation in consequence of the ignorance, helplessness, and dependence of such nation."

And he commended the passage of an act by the Legislature.

The report was adopted by the Commissioners of the Land Office, was transmitted to the Legislature, and chapter 255 of the Laws of 1909, concerning the construction of which we are here interested, was enacted.

After the passage of this act, a committee of the Land Board was appointed to negotiate a settlement of the Indians' claim under the authority of the act, and the land board decided to fix the amount of the settlement at $297,131.20, being the amount of the claim, with interest, together with an allowance of $27,131.20 for services and disbursements of attorneys.

The committee reported a form of proposed treaty, and at a meeting of the Land Board held in February, 1910, the report was adopted, and directed to be transmitted to Gov. Hughes. In May, 1910, Gov. Hughes communicated with the Commissioners of the Land Board stating that he had requested the Attorney General to make a report to him upon the matter, and to the effect that the Attorney General had stated that in his opinion the claim is without basis as a legal claim against the state, and that the only aspect in which it could be considered is as a benevolence or charitable gift, and that as a benevolence or charitable gift there is no legal objection against its being paid, that the Legislature has substantially the same power for making such a grant as in the case of pensions or bounties, and the Governor, in view of the Attorney General's statement that certain facts concerning the bearing of arms by the Indians against the citizens of the state and nation, and the occupation by the Indians of certain lands through the special benefaction of the state, returned without his approval to the Commissioners of the Land Office the report in order that the commissioners might give the matter such further consideration or recommendation as to them might seem advisable.

In May, 1910, the State Comptroller presented a report to the Commissioners of the Land Office, in which he, among other things, said:

"I am unwilling to concede that such injustice as is alleged was done the nation of Cayuga Indians by the state government. It is clear to my mind that the purchase of lands by the state from the Cayugas was a fair and equitable transaction, which was closed 115 years ago, and that there is no sound reason for reverting to that incident to establish a basis of any claim, moral or otherwise, against the state."

The Comptroller further said:

"As the point is clearly established by the decisions of the courts that these Indians have been and now are regarded as the wards of the state, it is proper that we should consider the question of their maintenance and relief as such. I am therefore disposed to address consideration to the question which has been brought before us by this legislation from the viewpoint of the present requirements of the Indians as such wards, rather than to measure those needs on the basis of a transaction occurring 115 years ago and which appears to have been equitable and proper in all respects."

The Comptroller further suggested that it was the duty of the commissioners to institute an investigation for the purpose of determining the present needs of the Cayuga Nation of Indians resident in this state. This report was unanimously adopted.

The commissioners at a meeting December 31, 1910, submitted a report on this claim for the consideration of their successors. They referred to Comptroller Williams' report, and that the Legislature of 1910 had appropriated $1,000 to determine the present needs of the Cayuga Indians. Col. Moulthrop, of Rochester, was employed to make a special report upon the present needs of the Indians resident in this state. He recommends that for an adequate financial relief $200,000 are necessary, out of which to provide yearly assistance and to purchase lands for allotments.

The commissioners recognize the urgent needs of these wards of the state, and believe that it would be proper for the Legislature to consider the matter of making an appropriation of a sum of money to be distributed by the Comptroller for the immediate relief of the petitioners, pending the final provision to be made.

The commissioners in March, 1911, referred the adjustment of the claim to the standing committee, consisting of the Attorney General, Treasurer, and State Engineer and Surveyor. Hearings were had, and it finally resulted that in July, 1911, the Commissioners of the Land Office recommended that the application of the Cayuga Indians residing in the state of New York be denied on the grounds that there was no legal basis for the claim, and also that there was nothing before the Land Board from which they could determine that the Indians have suffered any damage by reason of the purchase of the Indian title by the state and the subsequent sale by the state at a price in excess of the consideration paid the Indians in extinguishing the Indian right of occupancy in said lands.

The above is a mere historical outline of the basis of the claim, of the proceedings had concerning the same, and of its present status. It can hardly be said that the claim of the Cayuga Indians has been ignored by the state. It certainly has been considered intelligently and fairly.

[1] As has been stated, the Legislature has the power to make a charitable gift where the equities require it; but no state official is justified in passing any claim as a legal obligation of the state, which rests entirely upon equities which might justify a charitable gift.

The relators contend that the duty rests upon the Commissioners of the Land Office not to audit the claim, but to adjust and settle a claim which has been recognized by legislative enactment, and the

relators contend that the act of the commissioners in denying the application of the Cayuga Nation of Indians, on the ground that there was no legal basis for claim, is not a compliance with the provisions of the law empowering and authorizing the commissioners to adjust and settle the claim, and that therefore a writ should issue out of the court directing and compelling the commissioners to make "a fair and reasonable effort to negotiate with the said Cayuga Nation of Indians resident in the state of New York an adjustment of the claim embodied in the memorial of the said nation, and that if an agreement for the settlement of the claim is reached that then the commissioners enter into a contract."

The Attorney General contends that the act of the Legislature is only permissive, that the Legislature has no power to audit a claim, that the act is not mandatory, and that, in the consideration by the commissioners of the matters involved in the claim resulting in the denial by the commissioners of the obligation on the ground that there was no legal basis for the claim, the commissioners had complied with the provisions of the statute, that the act was judicial in its character and not ministerial, and that the court has no power to issue its writ compelling the Commissioners of the Land Office to act upon the claim in any particular or specified manner.

The Attorney General further contends that the title which the Indians had of the lands, concerning which the treaty of 1795 was made, was only a title of occupancy.

[2] The nature of the Indians' title to lands on this continent seems to have been clearly established. Judge Andrews, in Seneca Nation v. Christie, 126 N. Y. 135, 27 N. E. 278, says:

"It became the recognized principle that discovery followed by possession vested in the sovereign by whose subjects the discovery was made the absolute title to the soil of the lands within the limits of the discovered territory, subject, however, to the right of occupation by the Indian tribes, which could only be extinguished by their voluntary consent, unless forfeited under the laws of war. It was a necessary sequence to the claim that the sovereign had the ultimate title to the soil, that the right to extinguish the Indian occupation was exclusively vested in the sovereign. The Indians were held to be incapable of alienating their lands except to the crown, and all purchases made from them without its consent were regarded and treated as absolutely void. The title of the crown was subject to grant, but a grant from the crown only conveyed the fee subject to the right of Indian occupation, and, when that was extinguished under the sanction of the crown, the possession then attached to the fee, and the title of the grantee was thereby perfected. These general principles were announced by Chief Justice Marshall in the great case of Johnson v. McIntosh, 8 Wheat. 543 [5 L. Ed. 681], which has ever since been regarded as a sound exposition of the nature of Indian titles."

What has been referred to as a sale of lands to the state by the treaty of 1795 was an "extinguishment" of said Indian title, as is defined by Judge Andrews.

There seems to be sound reason in the contention of the Attorney General that there is no legal basis for a claim as such against the state by the Cayuga Nation of Indians.

The purchase of lands by a guardian from his ward and the sale thereafter at a larger consideration is quite different from the extinguishment of the Indian title by the sovereign. However that

question may finally be resolved by the court, or the other questions raised by the Attorney General, it seems as if the real question here was whether under the statute, which we must construe, it is within the power of the court to issue a writ of mandamus requiring and compelling the Commissioners of the Land Office to do more than they have done in the consideration of the memorial filed.

[3] The relators contend that mandamus will lie. As sustaining that contention, we are referred to People ex rel. Harris v. Commissioners of Land Office, 149 N. Y. 26, 43 N. E. 418. The authority does not sustain the relators. Judge Vann says:

"The primary object of the writ of mandamus is to compel action. It neither creates nor confers power to act, but only commands the exercise of powers already existing, when it is the duty of the person or body proceeded against to act without its agency. While it may require the performance of a purely ministerial duty in a particular manner, its command is never given to compel the discharge of a duty involving the exercise of judgment or discretion, in any specified way, for that would substitute the judgment or discretion of the court issuing the writ for that of the person or persons against whom the writ was issued."

Quoting from People ex rel. Francis v. Common Council of Troy, 78 N. Y. 33–39 (34 Am. Rep. 500), Judge Vann writes:

"A subordinate body can be directed to act, but not how to act, in a matter as to which it has the right to exercise its judgment. The character of the duty, and not that of the body or officer, determines how far performance of the duty may be enforced by mandamus. Where a subordinate body is vested with power to determine a question of fact, the duty is judicial, and, though it can be compelled by mandamus to determine the fact, it cannot be directed to decide in a particular way, however clearly it may be made to appear what the decision ought to be.

"It is a universal rule that, in the discharge of all duties involving the exercise of official judgment or discretion, the officer or tribunal must be left free to act, and cannot be controlled in a particular direction. When the law requires a public officer to do a specified act, in a specified way, upon a conceded state of facts, without regard to his own judgment as to the propriety of the act and with no power to exercise discretion, the duty is ministerial in character, and performance may be compelled by mandamus, if there is no other remedy. When, however, the law requires a judicial determination to be made, such as the decision of a question of fact or the exercise of judgment in deciding whether the act should be done or not, the duty is regarded as judicial, and mandamus will not lie to compel performance."

This certainly seems to be the true function of the writ of mandamus, and therefore it is not worth while to discuss other cases. It cannot be said of the Commissioners of the Land Office, a constitutional body made up of the state officers of which the Attorney General is a member, that in passing upon a matter of this importance, under a statute of the state which permits and authorizes them to consider it, and even to make an adjustment and settlement, if you please, that such a body is not called upon in the consideration of the questions which may arise to exercise any judgment or discretion, and that what it might do under the law is purely ministerial.

The disposition of this phase of the question submitted under this motion disposes of the motion. The relators claim that the statute is mandatory; the Attorney General holds that it is permissive.

To sustain the position of the relators as to the character of the statute, we are referred to People ex rel. Reynolds v. Common Council,

140 N. Y. 300, 35 N. E. 485, 37 Am. St. Rep. 563. In that case a peremptory writ of mandamus was issued, under a law authorizing the common council to audit and adjust the amount of damages sustained by a property owner claimed to have been caused by a local improvement, and the court said in effect that, conceding the words of the act conferring the power to audit and pay the claim were permissive only, they were to be considered as mandatory, for the reason that an award of damages confirmed by the court made by appraisers had the effect of a judgment, and vested in the relator an absolute right to receive the amount of the award.

In the absence of constitutional prohibition, the Legislature has power even to give proper tribunals jurisdiction to hear and determine claims against the state, which are founded in right and justice, but which might not be enforceable against an individual in the courts, by reason of strictly legal defenses.

[4] The enactment of the statute in question was clearly within the power of the Legislature. It might also have given to the Court of Claims jurisdiction over the matter. It saw fit to send the question to the Commissioners of the Land Office, not directing the commissioners what to do or how to do it, but authorizing and empowering the commissioners to adjust and to settle, not saying to the commissioners that they must adjust if in their judgment and discretion there was nothing to adjust, and not compelling the commissioners to enter into an agreement of settlement when in the performance of their official duties there was nothing in their opinion which justified a proposition on behalf of the state, which would meet the approval of the Cayuga Indians, and thereby effect a settlement.

If the relief asked by the relators should be granted and a peremptory writ of mandamus should issue compelling the Commissioners of the Land Office to make a "fair and reasonable effort to negotiate with the Indans," such effort might be entirely futile. Any proposition by the Commissioners of the Land Office would certainly not be approved of necessarily by the Indians. It takes two parties to make a settlement. It does not seem as if the court should be called upon to issue a writ of mandamus which, if recognized by the Commissioners of the Land Office, and an effort was made on their part to carry out the provisions of the writ, might be entirely useless and of no accomplishment, for the reason that the other party would not be pleased with the acts of the commissioners.

[5] This development of what might be the result under the writ shows that it is not a case in which the court would be justified in directing a writ to issue. Such a writ should only be issued where the nature of the ministerial act is so clearly defined that, when the court directs the board to act under the writ, there can be no doubt as to just what the board is to do and what will be the result of the doing.

It seems that it is not a case in which the aid of a writ of mandamus should be invoked.

The motion for the writ is therefore denied, with costs.