(152 App. Div. 543.)

PEOPLE ex rel. CAYUGA NATION OF INDIANS et al. v. COMMISSIONERS OF LAND OFFICE.

(Supreme Court, Appellate Division, Third Department.    September 11, 1912.)

1. STATUTES (§ 215*)—CONSTRUCTION—LEGISLATIVE INTENT.
    The court, in determining the intent of the Legislature in enacting a statute, must understand the situation as the Legislature did.
    [Ed. Note.—For other cases, see Statutes, Cent. Dig. § 291; Dec. Dig. § 215.*]

2. MANDAMUS (§ 81*)—OFFICIAL ACTS—PERFORMANCE OF STATUTORY DUTIES.
    Laws 1909, c. 255, requiring the commissioners of the land office to make a reasonable effort to negotiate with the Cayuga Nation of Indians an adjustment of the claims of the Indians on a basis not exceeding a specified sum, and that, if a settlement shall be reached, the Commissioners shall report to the Legislature whether a lease or purchase by the state of adequate lands for the Cayuga Nation may be procured, enacted with knowledge on the part of the Legislature that the Indians had no claim against the state enforceable at law or in equity, but that the state had received the sum stated as profits from land acquired from the Indians, leaving the Indians without a home and in distress, is an ac-

knowledgment of the state's moral obligation to the Indians, and a direction to the commissioners to attempt to make a settlement on the specified basis, and mandamus lies to compel the commissioners to attempt to make a fair and reasonable effort to negotiate with the Indians for an adjustment of the claim.

[Ed. Note.—For other cases, see Mandamus, Cent. Dig. §§ 138, 139; Dec. Dig. § 81.*]

3. STATES (§ 119*)—CLAIMS AGAINST STATE—SETTLEMENT.

The Legislature may provide for the payment of an equitable claim against the state, though it has no merit, except the fact that something ought to be received, under the circumstances, from the state.

[Ed. Note.—For other cases, see States, Cent. Dig. § 118; Dec. Dig. § 119.*]

Betts, J., dissenting.

Appeal from Special Term, Albany County.

Application by the People, on the relation of the Cayuga Nation of Indians, resident in the state of New York, and others, for mandamus against the Commissioners of the Land Office, to compel the commissioners to comply with Laws 1909, c. 255, by making a fair and reasonable effort to negotiate with the Cayuga Nation for an adjustment of a claim against the state. From an order of the Special Term (74 Misc. Rep. 154, 131 N. Y. Supp. 937) denying the application, relators appeal. Reversed, and motion for mandamus granted.

Argued before SMITH, P. J., and KELLOGG, HOUGHTON, BETTS, and LYON, JJ.

John Van Voorhis' Sons, of Rochester (C. H. Van Voorhis, of Rochester, of counsel), for appellants.

Thomas Carmody, Atty. Gen., for respondents.

JOHN M. KELLOGG, J. Chapter 255 of the Laws of 1909, so far as important here, reads as follows:

"An act to empower the commissioners of the land office to adjust the claim of the Cayuga Nation of Indians set forth in the memorial of the said nation, bearing date February 27th, nineteen hundred and six, and presented to the said commissioners.

"The people of the state of New York, represented in Senate and Assembly do enact as follows:

"Section 1. The commissioners of the land office are hereby empowered to adjust the claim embodied in the memorial of the Cayuga Nation of Indians, resident in the state of New York, bearing date of February twenty-seventh, nineteen hundred and six, and presented to the said commissioners by entering into an agreement with the said Cayuga Nation of Indians, resident in the state of New York, for a settlement of the said claim on a basis not exceeding the sum of two hundred and forty-seven thousand, six hundred and nine dollars and thirty-three cents, including interest on such sum from the day of the presentation of said memorial, to the commissioners of the land office, and computed to the day of settlement. The amount of such settlement shall be retained in the treasury of the state in trust for the said Cayuga Nation of Indians, and annual interest only on such sum at the rate of five per centum per annum shall be paid by the state to the said Cayuga Nation, except that such principal sum may be chargeable with the expense of said Cayuga Nation, in the making, prosecuting and settlement

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

of the said claim. Such settlement shall be subject to the approval of the Governor of this state.

"2. If settlement of the claim should be. reached, the commissioners of the land office shall be authorized thereafter to investigate and report to the Legislature, whether a lease or purchase by the state from the Seneca Nation of Indians, resident in the state of New York, of adequate lands for the use and occupation of said Cayuga Nation, and which shall be agreeable to said nation, can be procured for such purpose by the use of sufficient of the principal sum aforesaid."

The commissioners of the land office did enter into negotiations with the Cayuga Indians, and agreed to give them the maximum sum stated in the bill. The agreement was submitted to the Governor for his approval, and he asked the Attorney General for information, and the Attorney General reported that the Cayugas were disloyal to the colonies in the Revolution, and perhaps that fact and other considerations had been overlooked in making the settlement. The Governor referred the matter back to the commissioners with the opinion of the Attorney General. The commissioners thereupon referred the matter to a standing committee, consisting of the Attorney General, Treasurer, and state engineer, who, after various delays, reported to them that the application of the Cayuga Indians be denied upon the grounds: (1) That there is no legal basis for the claim. (2) That there is nothing before the land board from which it can determine that the Indians have suffered any damage by reason of the purchase of their lands by the state of New York. The report was adopted by the commission, and the application denied.

The relator contends that the act is mandatory, and required a bona fide effort to reach a settlement. It is claimed in reply that it is not mandatory, and that the commissioners might determine. whether the relators had a valid claim, or, if they thought best, to refuse to enter into negotiations and thus give no relief.

[1] In order to determine what the legislative intent was, we must understand the situation as the Legislature did. People ex rel. Kemmler v. Durston, 119 N. Y. 578, 24 N. E. 6, 7 L. R. A. 715, 16 Am. St. Rep. 859.

[2] Did the Legislature mean to refer the matter to a committee to have it determine whether the memorialists had a legal claim, or did it intend that they should have relief based upon the equities of the case? It is true that the Cayugas fought against the colonies in the Revolution, but the Legislature knew that fact. At the close of the War, the Cayuga Nation were in the possession of a large tract of land in the central part of the state. In 1783 Congress waived the right of conquest of the Indians, and proffered peace and friendly treaty for the purpose of receiving them into favor and protection. In October, 1784 (Act Oct. 22, 1784, 7 Stat. 15), a treaty of peace was made at Ft. Stanwix with the Six Nations (which included the Cayugas), and they were received under the protection of the United States. By the treaty, the Indians yielded to the United States all claim to the country west of the line running through Buffalo creek on Lake Erie to the Pennsylvania line, and, as to the land lying eastward of said line, they were

to be secured in possession thereof, except the fort at Oswego. In 1789 another treaty was made (Act Jan. 9, 1789, 7 Stat. 33), confirming this treaty and renewing peace and friendship. In 1786 a treaty was concluded between New York and Massachusetts, both of which claimed the territory in the western part of the state, by which New York ceded "the right of pre-emption of the soil from the native Indians and all their estate, right, title and interest (right and title of government, sovereignty and jurisdiction excepted)," and Massachusetts ceded to New York "the right of pre-emption of the soil from the native Indians and all other the estate, right, title and property which the commonwealth of Massachusetts hath of, in and to the residue of the lands and territories so claimed by the state of New York." The lands of the Cayugas were included in the lands ceded by Massachusetts to New York.

A treaty was made February 25, 1789 (1 Laws U. S. 1789–1815, c. 16, p. 319), between the Cayugas and the state of New York, whereby they ceded and granted all their lands to the people of the state. The treaty provided, "The Cayugas shall of the ceded lands hold to themselves and to their posterity forever for their own use and cultivation, but not to be sold, leased or in other manner aliened or disposed of to others," 100 square miles of lands described, in consideration of which the Cayugas received $500 in silver, $1,625 more to be paid June 1st, and an annuity of $500 annually thereafter. On June 22, 1790 (1 Laws U. S. 1789–1815, c. 16, p. 321), another treaty was made between the Cayugas and the state, by which the Cayugas acknowledged payment, and the former treaty was confirmed and continued:

"The said Cayugas do further hereby grant and release to the people of the state of New York all our right, interest and claim in and to all lands lying east of the line of cession by the state of New York to the commonwealth of Massachusetts, except the lands mentioned in the said deed of cession hereunto annexed are reserved to us, the Cayugas and our posterity."

In 1794 another treaty was made between the United States and the Cayugas (Act Nov. 11, 1794, 7 Stat. 44), by which peace and friendship was declared, and the United States acknowledged the lands reserved to the Oneida, Onondaga, and Cayuga Nations in and by their respective treaties with the state to be their property.

Chapter 70 of the Laws of 1795, entitled "An act for the better support of the Oneida, Onondaga and Cayuga Indians, and for other purposes therein mentioned," recited in its preamble:

"Whereas the Oneida, Onondaga and Cayuga tribes of Indians have sometimes collectively as tribes, and at other times individually, leased part of the land appropriated to their use, to the white inhabitants, and permitted others to settle and improve thereon without lease, which has occasioned controversy between themselves and between them and such settlers. And whereas the said tribes respectively have entreated the Legislature to make such arrangement relative to the premises as shall tend to prevent future controversy between themselves and between them and the white inhabitants settled on and occupying the lands aforesaid, and as shall tend to render the same more productive to the tribes respectively."

The act appointed a commission to make such arrangements with the Indians relative to the lands appropriated to their use

as might tend to promote their interests, and authorized them to extinguish the Indians' right to such land as was not set aside for individual occupancy by them by the payment of an annuity which shall not exceed 6 per centum on a principal sum which would arise if the lands were sold for 50 cents per acre. The act provided that the Surveyor General should without delay sell the lands so acquired for not less than $2 an acre. Govenor Clinton sent to the Legislature a veto message of this bill, upon the ground that it was three-fourths for the benefit of the state and not a disposition for the sole benefit of the Indians, but the Legislature passed the act over the veto with a two-thirds vote. The lands were sold and the state received for them $247,609.33 more than the 50 cents an acre which was allowed to the Indians therefor.

March 16, 1853, Dr. Peter Wilson, a Chief of the Cayugas, presented to the state a memorial claiming that these profits should be accounted for to the Cayugas. The Indians' position is summed up in his memorial as follows:

"You were our guardian; you have made a great profit out of your ward which you do not allow in the case of your own people."

And he submitted that, as a matter of equity and fairness, the profits belonged to the Indians. From that time down to the time of the passage of the bill in question, the claim of the Cayugas, not as a matter of law or of right, but as a matter of justice, was before the public, and frequently considered by the Legislature and legislative committees. In 1906 in behalf of the Cayuga Nation the memorial referred to in the act in question was presented to the commissioners of the land office. They referred it to the Attorney General, who reported that the commissioners had not jurisdiction to entertain it.

In 1907 chapter 492 was passed, by which the commissioners of the land office were empowered to hear the memorial and investigate the claim set forth therein, and report to the Legislature with their recommendations. After due consideration, the commissioners of the land office appointed Joseph A. Lawson, a lawyer at Albany, as their agent, to examine into the matter, and report the facts to the commission. In his report dated April 30, 1908, he recites the facts, and concludes:

"That the Cayuga Nation of Indians, resident in the state of New York, the petitioner herein, has no claim to the said sum of $247,609.33 alleged to be the profits accruing to the state of New York upon the purchase of the lands from said nation by said state as set forth in the memorial herein, enforceable at law or in equity in any of the tribunals of this state, and that said sum of $247,609.33 is in no sense a measure of damages sustained by said Cayuga Nation by reason of said purchase and sale as aforesaid."

But, in view of the fact that the Cayugas have not been allotted a reservation of lands and are without an abiding place except by the sufferance of the Seneca Nation, with whom they reside, he advises that:

"There rests a moral obligation upon the people of the state of New York to make further provision for the support and maintenance of the said Ca-

yuga Nation, based upon the consideration of and with reference to said sum of $247,609.33 as the profits realized by the state from the sale of the lands heretofore belonging to said nation and made possible by reason of the superior knowledge, ability and position of said state in its negotiations with said Cayuga Nation in consequence of the ignorance, helplessness and dependence of such nation."

And he therefore commended the passage of an act by the Legislature drawn by himself, which report was adopted as the report of the, board and transmitted to the Legislature, who thereafter passed the act in question.

It is apparent, therefore, that, when the act was passed, the Legislature knew that the Cayugas had no claim which was enforceable against the state in law or in equity, but that the state had received the sum stated in the act as profits from land which it had acquired from the Indians and immediately sold at four times the purchase price; that the sale of the lands left the Indians without a home and in distress. What, then, was the intent of the Legislature in passing the act in question? It did not want the commissioners again to determine that the Indians had no legal or equitable claim which they could enforce against the state, because the board had reported that fact, and the act in question was passed upon that report. It seems to me the act in question was a determination by the Legislature that these profits should be used as a basis for some reasonable relief to the Indians along the lines of the Lawson report. The Legislature had, in fact, approved of this report, and the act in question was passed pursuant to its recommendations. The state acknowledged the moral obligation, and directed the commissioners to square it. The act was a legislative mandate to the board to carry into effect that report. The only duty of the commission was to assume that the state had made a profit of the amount stated, and to assume that such profits were a basis for granting such relief to the Cayugas as their homeless, destitute condition made proper and necessary. The state had acquired from them their homes, and the act assumes that some provision must be made to render their position more tolerable. The act contemplates that the moneys allowed should be retained by the state at 6 per cent. interest, and an annuity paid to the Indians. The commissioners are, however, required to investigate and report to the Legislature as to whether suitable lands could be purchased from the Senecas as a home for the Cayugas by the use of the funds realized from the settlement.

In American Bank Note Co. v. State, 64 App. Div. 227, 71 N. Y. Supp. 1049, this court considered an act authorizing the Court of Claims to audit and determine the alleged claim of the plaintiff for engraving licenses, with the usual provision that no award should be made unless the facts proved made out a case against the state, which would create a liability were the same established in a court of law or equity against an individual, etc. The superintendent of public works had ordered from the plaintiff certain licenses for steamboat inspectors. The plaintiff was not the public printer, and under the law such a contract could only be given to

the public printer. The Supreme Court by mandamus required the Comptroller to audit the claim. This court reversed the order on the ground that there was no legal claim in behalf of the plaintiff against the state. People ex rel. American Bank Note Co. v. Morgan, 45 App. Div. 86, 60 N. Y. Supp. 1109. It had, therefore, been determined before the act in question was passed that the plaintiff had no claim which could be enforced against the state. The Court of Claims dismissed the plaintiff's claim upon the ground that it had already been adjudicated that there was no legal claim. This court reversed the judgment, holding that the act in question did not submit the legality of the claim to the Court of Claims, as the Legislature, when it passed the act, knew that it had already been adjudicated that there was no legal claim, but that the Legislature had apparently recognized that the plaintiff had done the work. The state had had the benefit of it, and upon equitable consideration it was proper that the state should reimburse the plaintiff. Justice S. Alonzo Kellogg, writing for the court, says:

"To impute to that august body the intention to juggle with the claim or to be so facetious is to express a lack of respect for this branch of the government and such imputations are not to be judicially entertained."

Again he says:

"The act itself has upon its face this intention (to pay the claim). It were otherwise a fruitless act, a mockery, a reproach to the state, greater even than the reproach of shielding itself from payment because the purchase was unauthorized, though innocently made, and notwithstanding the state then held and used the thing purchased. I think it entirely consonant with the dignity of a great state to assume that it had a purpose in passing this act, a purpose beneficial to the claimant. I think the Legislature intended to provide a way by which this claim could be paid."

[3] Wheeler v. State, 97 App. Div. 276, 90 N. Y. Supp. 18, affirmed 190 N. Y. 406, 83 N. E. 54, 123 Am. St. Rep. 555, and Quayle v. State, 192 N. Y. 47, 84 N. E. 583, carry the same inferences and recognize the propriety of the Legislature providing for the payment of an equitable claim, although it has no merit, except the fact that something ought to be received under the circumstances from the state.

I therefore favor a reversal of the order of the Special Term and the granting of the motion for a mandamus. All concur, except BETTS, J., dissenting and voting for affirmance on opinion of RUDD, J., at Special Term (74 Misc. Rep. 154, 131 N. Y. Supp. 937).