ST. REGIS TRIBE OF MOHAWK INDIANS, by NORMAN TARBELL et al., Individually as Duly Enrolled Members and as Duly Elected Chiefs of the St. Regis Tribe of Indians, on Behalf of All St. Regis Indians, Respondents, *v.* STATE OF NEW YORK, Appellant. (Claim No. 32879.)

Third Department, December 19, 1957.

*Louis J. Lefkowitz, Attorney-General* (*John R. Davison* and *Peter E. Herzog* of counsel), for appellant.

*Thomas F. Moore, Jr.,* and *Edward L. Ryan* for Power Authority of the State of New York.

*William H. Quimby, Jr.,* and *Arthur B. Hart* for respondents.

BERGAN, J. The State of New York has undertaken to appropriate for the development of a power project Barnhart's Island in the St. Lawrence River; the bed of the river; and intrinsic water power in the river surrounding the island. The St. Regis Tribe of Mohawk Indians, alleging an interest in the appropriated property, has filed a claim for damages for $33,800,000 in the Court of Claims. The State's motion to dismiss the claim has been denied and the court has held that the claim states a good cause of action which has not been released and which is prosecuted by competent and proper parties.

Prior to the settlement of the area by European peoples, the St. Regis Tribe had acquired by occupation and use an interest in the island in dispute and to substantial areas in the St. Lawrence Valley. The present interest of the St. Regis Tribe as pleaded is that " claimants make claim of immemorial rights arising prior to white occupation, consisting of immemorial possession and use including original title to those rights which are the subject of the appropriation by the State of New York."

The Treaty of Paris which in 1783 ended the Revolutionary War, laid down a boundary between the United States and Canada as " along the middle " of the St. Lawrence River. The literal location of this " middle line " ran south of Barnhart's Island, which was thereupon regarded as being in Canada. The line was more definitively laid down in 1822 by commissioners representing both the United States and Great Britain " in conformity with the true intent " of the Treaty of 1783.

This determination was made in June, 1822; and was in pursuance of the " Treaty of Peace and Amity " between the two nations at Ghent in 1814 which, among other things, settled the War of 1812. By the 1822 determination of the " true intent of " the Treaty of Paris, Barnhart's Island was located south of the International Boundary and thus in the State of New York.

In 1791 the New York State Commissioners of the Land Office made a contract with Alexander Macomb for sale to him of land along and islands in the St. Lawrence. From this contract was exempted a described area to be set apart as a reservation for the St. Regis Indians.

Five years later, in 1796 the St. Regis and other tribes of Indians ceded to the State of New York " All * * * Lands within the * * * State ". From this cession was excepted the same parcel to be used as an Indian reservation referred to in the Macomb contract and some other exceptions not here material. Barnhart's Island was not excepted from the general cession from the St. Regis Indians to the State.

Thus the Indian title to Barnhart's Island, if within the State of New York, must be deemed to have been intended to have been conveyed to the State by the St. Regis Tribe by the general cession in 1796. In the previous year the St. Regis Tribe had leased the island to one G. Barnhart for 999 years; modified in 1806 by a further lease for 99 years which would by its terms have expired in 1905. A memorial of this lease was recorded in Canada.

In the meantime Macomb's assignees pressed the State for a patent for the islands in the St. Lawrence which the State had agreed to sell under the 1791 contract; but although the Attorney-General was of opinion in 1806 that the contract was still valid, the Legislature by resolution expressed the view that until the line of territory and jurisdiction in the river be determined and established, " no grant can with propriety be made thereon " as to such islands " as may probably fall within the limits of this state " and requested the Governor to seek to effect a determination of the line. (Assembly Journal, 30th Session, 1807, pp. 328–329.)

The boundary line having been settled in 1822 by commissioners in pursuance of the Treaty of Ghent, as it has been noted, the State in 1823 patented Barnhart's Island to D. A. and G. Ogden, then the assignees of the Macomb contract of 1791.

The Barnharts being in possession of the island under the St. Regis lease of 1795, the Ogdens sued them in the New York Supreme Court in ejectment. The Indian lease was offered by the defendants in support of the right of occupancy; but the court held the patent from the State was controlling and judgment of ejectment was entered against the occupants in favor of the State's patentees.

This was a judicial determination between parties holding under Indian rights and those holding under a State patent to the same land that the patent was paramount. The predecessors

of the present claimants were not parties to the action in eject-
ment and not bound in the sense of *res judicata* by that judg-
ment; but the judgment is a guide to the contemporary view of
the nature of the legal issues involved and of the prevailing
rights under the Indian claim of title and to the State's title;
and it is a precedent of direct pertinence to these issues.

Since the State's title had been held to prevail on the island,
both the St. Regis Tribe and their lessee who had lost the law-
suit petitioned the Legislature for relief. The Indians asked
for a conveyance '' of certain islands in the River St. Lawrence,
or an equivalent in money ''.

This was referred to the Commissioners of the Land Office
who examined the question and, in a report to the Legislature in
1843, were of opinion that it had been intended by the Indians
in the Treaty of 1796 to release all claim to islands in the State
including such as were definitively brought within the State by
the settlement of the boundary line and that '' such general
extinguishment of title is equally within the spirit as the letter
of such treaty.'' The commissioners contended the petitioners
to the Legislature '' have neither in law or equity the least
claim to the relief sought in their petition.''

Nevertheless, on renewal by the St. Regis Indians of their
petition in 1856 the Assembly Committee on Indian Affairs
recommended an appropriation of $5,960 in compensation for
Barnhart's and another island; and this sum was appropriated
and paid. In the archives of the State are appropriate entries
from the Comptroller's records of both warrant and payment of
$5,960 to the St. Regis Indians '' in full of their claim for the
sale by the State, of two islands in the River St. Lawrence,
known as Barnhardt's and Baxter's Islands $5,960.00 ''.

On the State's motion to dismiss the claim the Court of Claims
ruled that a triable issue of fact on the question of title or inter-
est was presented which precluded dismissal as a matter of law.
The court was in agreement with the argument advanced by the
State that the original right of occupancy of land by Indian
tribes is not the kind of property right for the extinguishment
of which the State is required to pay compensation. But it held
that there would be an open question of fact to determine, as
we read the court's opinion, whether there had been such a
'' recognition '' of the Indian title by New York and by the
British or Canadian Governments, the predecessors of New
York in sovereignty, as '' to make such interest and rights
compensable ''.

A triable issue of title or interest does not demonstrate itself.
The record of public transactions between the St. Regis Indians

and the State shows no title by these Indians in Barnhart's Island cognizable in a firmer or different fashion than those arising from Indian custom and usage generally; and the prohibition by the British Government on October 7, 1763 against further occupation of Indian lands by the subjects of the King without official permission was not a " recognition " of a legally enforcible title to the Indians whose right to usage of their lands was thus protected by the British Government; and it certainly cannot be held to have operated to limit the rights of the British Government itself in respect of those lands nor the rights of the State as the successor to its sovereignty.

The recognition of such Indian rights by the New York Constitution; by its statute or decisional law in such a manner as to make compensable the taking of these claimed rights presents neither a triable issue of fact nor an admissible argument of law.

The constitutional provision relied upon (N. Y. Const., art. I, § 13) prohibits the purchase or contract of sale with Indians of any lands unless by the authority and with the consent of the Legislature. This provision, coming from the first Constitution of 1777, represents substantially the same policy announced by the British Government in 1763; it imposes a limitation upon private land dealing with Indians. It cannot be read fairly to impose a limitation upon appropriation of Indian lands by the sovereign or to be any recognition whatever of title in the Indians assertable against the sovereign.

Nor can the decisional law relied upon be deemed such a " recognition " of title. The decision, for example, in *Seneca Nation* v. *Christie* (126 N. Y. 122) lays down the rule that the establishment of the Federal Government did not deprive New York of sovereign power in dealing with Indians within its borders; and that grants made under the aegis of State authority and treaty were binding on the Indian successors of the grantor. The decision in *Goodell* v. *Jackson* (20 Johns. 693) was an elaborate judicial demonstration by Chancellor KENT for the Court of Errors against the right of a private white person to take a good title from an Indian without consent of the Legislature under the constitutional limitation; and *Lee* v. *Glover* (8 Cow. 189) holds the same thing.

The case law in New York certainly does not seem to give support or comfort to the argument advanced for it that it amounted to a recognition by the State of an Indian title for which the State must pay to extinguish.

The statute law (Public Authorities Law, § 1007, subd. 10; Highway Law, § 30, subds. 2, 14) authorizing certain takings

for public uses and defining rights to be taken must be deemed in fair context to refer to rights recognized at law and not itself to amount to a new recognition of original Indian titles or make their taking compensable.

The Federal decisional law is clear upon the point that as against the United States, the right of occupancy to land by Indian tribes is not a property right for the extinguishment of which the sovereign is required to pay compensation. (*Tee Hit Ton Indians* v. *United States,* 348 U. S. 272; *United States* v. *Santa Fe Pacific R. R. Co.,* 314 U. S. 339; *Shoshone Indians* v. *United States,* 324 U. S. 335.)

The obligation to pay compensation for the exercise of public power in the taking of private property imposed on the United States (U. S. Const., 5th Amdt.) and on the State (N. Y. Const., art. I, § 7) is identical in scope and effect. The constitutional principles which underlie the freedom of action of the United States in this area apply with equal force to the Government of New York within its own jurisdiction.

Besides this, it was clearly the intention of the United States and Great Britain to settle a line in the St. Lawrence River left in doubt and dispute following the Treaty of Paris; and the broad sweep of conveyance of all lands by the St. Regis Indians to the State of New York in 1796 with specific reservations not including Barnhart's Island must be construed as intending to convey land later definitively placed on the New York side of the disputed border. No suggestion of any intent to be more specific about the line of conveyance appears in the Indian treaty of 1796 than appears in the accord between the two countries at Paris in 1783.

Moreover, the record shows that whatever claim may have existed has been released; and the facts in this respect being undisputed and depending on documentation and public records, no triable issue on such release is shown. The intent of the St. Regis Indians to discharge whatever title they might claim to have been left over from the 1796 cession is made manifest by the petition to the Legislature, renewed in 1851 after it had been rejected on a consideration of the merits, by the payment of the 1856 appropriation. We see no triable issue in all this.

The order should be reversed and the claim dismissed, without costs on the following grounds: (1) that no legal title to the real property asserted in the claim exists in claimants; and (2) the claim has been released and discharged.

FOSTER, P. J., HALPERN and GIBSON, JJ., concur.

Order reversed and claim dismissed, without costs.