**TUSCARORA NATION OF INDIANS, also known as Tuscarora Indian Nation, Plaintiff,**

**v.**

**POWER AUTHORITY OF The STATE OF NEW YORK, Robert Moses, and Superintendent of Public Works of The State of New York, John W. Johnson, Defendants.**

**Civ. A. 7844.**

United States District Court
W. D. New York.
June 24, 1958.

See, also, 161 F.Supp. 702.

Strasser, Spiegelberg, Fried & Frank, New York City (Arthur Lazarus, Jr., Washington, D. C., of counsel), for plaintiff.

Thomas F. Moore, Jr., New York City, for defendants Power Authority of the State of N. Y. and Robert Moses.

Louis J. Lefkowitz, Atty. Gen., of the State of New York; Paxton Blair, Solicitor Gen. of the State of New York, Albany, N. Y. (Julius L. Sackman, Albany, N. Y., of counsel), for defendant John W. Johnson.

MORGAN, District Judge.

The complaint in this action was filed in the Southern District of New York on April 19, 1958. The action is one for declaratory judgment, wherein the plaintiff prays

(1) That it have a judgment and decree of this court defining its rights and status therein, particularly adjudicating that neither of the defendants, nor any of them, had any right, authority or power to acquire, or attempt to acquire, by appropriation or otherwise, any or all of the lands belonging to plaintiff within the Tuscarora Reservation;

(2) That a temporary restraining order be granted restraining and enjoining the defendants and each of them and their agents, servants, employees and attorneys, and all persons in active concert and participation with them, from entering upon, or taking any action with regard to any appropriation of land belonging to the plaintiff within the Tuscarora Reservation;

(3) That a permanent injunction permanently granting the relief sought by the temporary restraining order be granted;

(4) That this court set aside, vacate and annul all descriptions, maps, notices and other instruments in connection with the purported appropriation.

The complaint alleges that plaintiff is a recognized tribe of American Indians residing on the Tuscarora Reservation in Niagara County, New York. The complaint further alleges the existence of an actual controversy "which is definite, concrete, real and substantial, which involves and affects the legal relations of plaintiff and defendants, and vitally affects the public interest." This action is brought under Sections 2201 and 2202, Title 28 U.S.C. and the complaint alleges jurisdiction by reason of Title 28 U.S.C. Section 1331. The plaintiff claims relief under Article I, Section 8, of the Federal Constitution, authorizing Congress to regulate commerce with the Indian tribes, and Treaties of October 22, 1784,[1] 7 Stat. 15, and November 11, 1794,[2] 7 Stat. 44, entered into by the United States and the Six Nations of Indians, including plaintiff, and R.S. Section 2116, 25 U.S.C.A. § 177, and the Act of September 13, 1950, 25 U.S.C.A. § 233, relating to the alienation of Indian lands.

The defendant Power Authority of the State of New York is a corporate instrumentality and a subdivision of the State of New York. The defendant Robert Moses is the Chairman of the Power Authority of the State of New York and the defendant John W. Johnson is the duly appointed and acting Superintendent of Public Works of the State of New York.

It further appears that Averell Harriman, Governor of the State of New York, on April 11, 1958 signed into law Chapter 646 of the Laws of 1958, amending paragraph 1 of Section 1007(10) of the Public Authorities Law, as follows:

"The authority may determine what real property is reasonably necessary for the improvement and development of the Niagara River or the International Rapids section of the St. Lawrence River. If funds are made available by the authority to the state for payment of the cost and expense of the acquisition thereof, the superintendent of public works, when requested by the authority, shall acquire such real property in the name of the state by appropriation and, where necessary, remove the owner or occupant thereof and obtain possession, according to the procedure provided by section thirty of the highway law, insofar as the same may be applicable. The authority shall have the right to possess and use for its corporate purposes, so long as its corporate exist-

1. Treaty between the United States and the Six Nations concluded at Fort Stanwix in 1784 and proclaimed October 22, 1784. 7 Stat. 15.

2. Treaty between the United States and the Six Nations concluded at Canandaigua in 1794 and proclaimed January 21, 1795. 7 Stat. 44.

ence shall continue, all such real property and rights in real property so acquired."

Acting under the amendment provided by Chapter 646 of the Laws of 1958 of the State of New York as above indicated, the Power Authority of the State of New York obtained, after a long and at times bitter contest before the Congress of the United States, the status of a licensee of the Federal Power Commission, an agency of the United States Congress, to which the latter had delegated its authority concerning water power and hydroelectric development. While this debate in the Congress of the United States was proceeding as to what agency, if any, would be the representative of the United States following its treaty with the Dominion of Canada in 1950, the Dominion of Canada proceeded immediately, and has created, and is now utilizing, a very modern and most valuable hydroelectric power system, the turbines of which generate power and have for some years past; parenthetically, following the destruction of the Niagara Mohawk plant (formerly the Niagara Power Company) on the American shore of the Niagara River, negotiations were entered into resulting in sale by the Dominion of Canada to the United States of power from this very new equipment. Thus, in the final legislation by the Congress, empowering the Power Authority of New York to proceed as a licensee of the Federal Power Commission; and in the State of New York legislation of 1958, germane to the issue of power; time was shown to be most important.

The plaintiff claims that the Power Authority in its attempt to occupy lands of the plaintiff, is offending federal treaties and statutes and that the defendants have not requested, nor has the Congress of the United States granted, permission to acquire lands belonging to plaintiff. The plaintiff further alleges that the 1,300 acres of land within the Tuscarora Reservation which defendants have purported to appropriate is of a unique character to plaintiff; in that it has been occupied by the Tuscarora Nation for over 150 years; and is land upon which they hope and intend to live in the future. Plaintiff further alleges that in the event that an area of the Reservation is taken, it cannot acquire by purchase similar contiguous land by using the proceeds from the lands taken "since any newly acquired lands would not be part of plaintiff's community and would be alien to plaintiff's customs, traditions and history."

■ This is a novel argument in view of the fact that the 1,300 acres was purchased by the antecedents of those constituting the Tribe of Tuscarora Indians with moneys obtained from the sale of lands originally owned by this Tribe in North Carolina. The plaintiff further contends that the unique character of the land on the reservation is in sharp contrast to all alternative land available to the defendants outside the reservation. This is of no avail, as many cases have determined this to be a legislative and not a judicial question.

A great deal of historical and legal material respecting Indian lands generally, and the land of this plaintiff in particular, has been submitted by the parties. The reservation of this plaintiff appears to be unique among Indian lands in New York. The records indicate that a few Tuscaroras settled at or near the present reservation as early as 1780,[2a] but the tribe does not appear to have acquired legal title to the present reservation lands until some 20 to 30 years later, between 1800 and 1810. In addition, none of plaintiff's land was ceded or allotted to it either by the United States or the State of New York. The land was acquired in three parcels, to wit: one parcel acquired by deed from the Seneca Nation;[3] a second parcel ac-

2a. Turner, The Pioneer History of the Holland Purchase of Western New York (Buffalo: Geo. H. Derby & Co., 1849), pp. 182–3.

3. Deed of Conveyance of 640 acres from Seneca Indians to Tuscarora Indians dated March 30, 1808, recorded in Liber

quired by grant from the Holland Land Co.; and the third parcel acquired by purchase from the Holland Land Co.[4] It is from this third parcel of 4,329 acres that defendant Power Authority wishes to take approximately 1,300 acres of land to construct a reservoir. There is no dispute among the parties concerning the way in which plaintiff acquired the disputed tract.

Plaintiff claims the protection of the Treaties of Fort Stanwix, signed October 22, 1784, and the Pickering Treaty, signed November 11, 1794. In these treaties, the United States guaranteed the Six Nations peaceful possession of the land upon which they were settled. While these guarantees might conceivably apply to parts of parcel one or two, since some Tuscaroras appear to have settled therein between 1780 and 1795 even though title was not acquired until after 1800, they cannot apply to tract three, since the tribe did not settle therein until some time after 1804 and did not acquire title until 1809. It is not reasonable to interpret either treaty, in the absence of specific language so providing, to apply the guarantees contained therein to after-acquired lands. While such an interpretation might reasonably be made where the United States had ceded or allotted the after-acquired lands to plaintiff, such a result could never obtain where the after-acquired lands were purchased by plaintiff. In the latter eventuality, the only limit on the size of plaintiff's reservation would be the extent of its ability to purchase additional land. Certainly, it is not reasonable to assume that any of the parties to the treaties relied on by plaintiff had this result in mind.

The character of plaintiff's interest in the disputed land, and the location and control of the fee in that land, raises a two pronged problem. The first concerns the history of the specific fee involved, and the second, as mentioned previously, concerns the character of the fee in Indian lands generally.

The area in which plaintiff's land is located, originally came under the dominion of the British Crown. The area was granted to the colony of Massachusetts under a charter issued by King Charles I.[5] Apparently, the same area was granted to the colony of New York under a charter issued by King Charles II.[6] Following the signing of the peace treaty between the United States and Great Britain, which terminated the Revolutionary War, a dispute arose between the newly independent states of New York and Massachusetts as to ownership and control of the area, including plaintiff's reservation. The dispute was settled by the so-called "Hartford Compact of 1786",[7] by which the two states agreed that New York would have governmental control over what is now Western New York. The parties agreed inter alia to the drawing of a line running north-south from Lake Ontario along the westerly shore of Seneca Lake to the present New York-Pennsylvania border. East of this line, New York was recognized as having the pre-emption right in the land. West of this line, the same right was vested in Massachusetts. In 1791 and 1792, Massachusetts, pursuant to the Hartford Compact, sold to Robert Morris all of its right, title and interest, including "the right of pre-emption of the soil from the native Indians", to the area west of a line running generally

151, Pages 168–169, Niagara County Clerk's Office, Lockport, New York.

4. Deed of Conveyance of 4,329 acres from Henry Dearborn, Secretary of the War Department to Tuscarora Indians dated January 2, 1809, recorded in Liber A, Page 5, Niagara County Clerk's Office, Lockport, New York.

5. The Charter of the Colony of Massachusetts Bay in New England, 1628–9 (N.Y. Leg.Doc. No. 51, 1889, pp. 94–100).

6. Grant from the King of England to the Duke of York, dated March 12, 1664 (N.Y.Leg.Doc. No. 51, 1889, pp. 100–104).

7. Hartford Compact between New York and Massachusetts concluded December 16, 1786, recorded in Liber 1, pages 270–280 of Miscellaneous Records in the Cattaraugus County Clerk's Office, Little Valley, New York (N.Y.Leg.Doc. No. 51, 1889, pp. 105–111).

north-south from Lake Ontario through Geneseo to the New York-Pennsylvania border.[8] Morris then conveyed all of his right, title and interest in these lands to the Holland Land Company.[9] The deeds involved in effect required Morris to extinguish the Indian right of occupancy in the lands concerned, as a result of his covenant to remove all encumbrances. Pursuant to this covenant in 1797, Robert Morris entered into an agreement at Geneseo, the so-called "Treaty of Big Tree",[10] at which the Seneca Nation transferred all of its right, title and interest to Morris for a valuable consideration. The agreement specifically reserved ten tracts of land to the Indians, not including any part of plaintiff's reservation. Some question has been raised as to whether or not the Seneca grant was left out of the treaty by inadvertence, as in the case of the Oil Springs Reservation, so that original title remained in the Seneca Nation.[11] It should be noted that a United States Commissioner, one Jeremiah Wadsworth, was present at the making of the agreement, as a result of which the United States appears to have acquiesced to the agreement. As a result of the treaty of "Big Tree", it appears that the deed of the Seneca Nation to the Tuscarora of 640 acres in 1808 was a nullity in that the Senecas had nothing to convey. The transfer was never objected to by the Holland Land Company, its successors or assigns. It might be noted that, in correspondence between Joseph Ellicott and Theop. Cazenove, both officers of the Holland Land Company, an intention was expressed to confirm the Seneca grant, but to reserve to the Holland Land Company the pre-emptive right.[12] No formal action was taken in this regard until the company's conveyance in 1810 to David Ogden.

As a result of the above, assuming the Seneca Nation possessed the right of original Indian occupancy, and no reason appears for assuming that the truth is otherwise, the original right of Indian occupancy and the pre-emptive right in the lands now occupied by plaintiff were actually extinguished by the treaty of "Big Tree". Some question might be raised as to whether or not this is so with regard to the Seneca grant on a formal basis, in view of the 1810 conveyance by the Holland Land Company of its pre-emptive rights in 1920 acres in the Tuscarora Reservation to David Ogden,[13] this acreage being equiv-

8. Deed of Conveyance from the State of Massachusetts to Robert Morris dated May 11, 1791 (N.Y.Leg.Doc. No. 51, 1889, pp. 112–114).

  Release and Conveyance by the State of Massachusetts to Robert Morris dated June 20, 1792 (N.Y.Leg.Doc. No. 51, 1889, pp. 115–116).

9. Deed of Conveyance from Robert Morris to Herman LeRoy and John Lincklaen, agents for the "Holland Land Company", dated December 24, 1792 (N.Y. Leg.Doc. No. 51, 1889, pp. 117–120).

  Deed of Conveyance from Robert Morris to Herman LeRoy, John Lincklaen and Gerrit Boon, agents for the "Holland Land Company", dated February 27, 1793 (N.Y.Leg.Doc. No. 51, 1889, pp. 121–123).

  Deed of Conveyance from Robert Morris to Herman LeRoy, William Bayard and Matthew Clarkson, agents for the "Holland Land Company", dated July 20, 1793 (N.Y.Leg.Doc. No. 51, 1889, pp. 124–127).

  Deed of Conveyance from Robert Morris to Herman LeRoy, John Linklaen and Gerrit Boon, agents for the "Holland Land Company", dated July 20, 1793 (N.Y.Leg.Doc. No. 51, 1889, pp. 128–130).

10. Agreement concluded between Robert Morris and the Seneca Indians at Big Tree (Geneseo, New York) September 15, 1797 (N.Y.Leg.Doc. No. 51, 1889, pp. 131–134).

11. Royce, Indian Land Cessions, 18th Annual Report of the Bureau of American Ethnology, Part 2 (Washington: Government Printing Office, 1899), p. 773.

12. Letter from Theophilius Cazenove to Joseph Ellicott dated May 10, 1798 (32 Buffalo Historical Society Publication, pp. 21–30).

13. Deed of Conveyance from Holland Land Company to David A. Ogden, dated September 12, 1810, recorded at No. 1 of Deeds, page 68, Erie County Clerk's Office, Buffalo, New York.

alent to the Seneca grant and the Holland grant to the Tuscarora Reservation combined. This interest was later conveyed by the Ogden Land Company to others [14] in 1821, and presumably resides at present in the heirs or assigns of the said grantees. There does not appear to have been a conveyance of the pre-emptive right as such in the Tuscarora purchase subsequent to the treaty of "Big Tree." In any event, the present title to all of the land of plaintiff was acquired from grantees of the sovereign who possessed the pre-emptive right, and who had previously extinguished the original right of Indian occupancy. This right, once having been extinguished, could not be revived, even if title was thereafter acquired by those who originally possessed that right. The obvious policy of the sovereign was to extinguish the original Indian title to all but reserved Indian lands. Original Indian title was viewed as an encumbrance on land, rather than a legitimate general interest, since it could be held only by the original Indian tribes and it was the intention of the sovereign that Indians should be confined to specific tracts, and the state generally opened to white settlement. In view of this policy, it cannot be argued that original Indian title can in any manner be revived once it has been extinguished. Plaintiff here, of course, historically did not possess original Indian title in the lands which they now occupy. They hold title by deed and not by original right of Indian occupancy.

The foregoing is as brief a sketch as possible of the title to the specific land at issue. However, to determine exactly what interest the plaintiff acquired when it acquired title, we must look to the general law regarding Indian lands. The basic statement of the legal character of such lands is to be found in the landmark opinion of Chief Justice John Marshall in Johnson v. McIntosh, 8 Wheat 542, 21 U.S. 542 at page 583, 5 L.Ed. 681.

The effect of this decision, which has been uniformly followed since its issuance in 1823, is to confirm in the Indian tribes merely a "right of occupancy, and that the exclusive power to extinguish that right, was vested in that government which might constitutionally exercise it." In the earlier case of Fletcher v. Peck, 6 Cranch 87, 10 U.S. 87, 3 L.Ed. 162, Chief Justice Marshall said, with respect to lands within another of the thirteen colonies, to wit, Georgia, that the question whether vacant lands within the United States were joint property or belonged to the separate states had been compromised; that since the vacant land at issue therein was within the State of Georgia, that state had the power to grant it; and finally, that the nature of Indian title was such as not to be inconsistent with seizin in fee on the part of the state.

The reasoning found in the Johnson and Fletcher cases forms the basis for the view that in the thirteen original colonies the fee to all land within the state passed directly from the Crown to the sovereign state following the revolution; that the United States never had title to such lands, and that as the Indians had at best a mere right of occupancy, the fee to their lands resided in the state. This status is in contrast to that of all lands, and particularly Indian lands, outside the original thirteen colonies, which were federally owned before being divided into sovereign states. This view is succinctly set forth in Seneca Nation of Indians v. Appleby, 127 App.Div. 770, 112 N.Y.S. 177 at pages 188–189, reversed on other grounds at 196 N.Y. 318, 89 N.E. 835; in Seneca Nation of Indians v. Christie, 126 N.Y. 122, 27 N.E. 275; Jones Cut Stone v. State, 7 Misc.2d 1048, 166 N.Y.S.2d 742, and in several reports and opinions of Congressional Committees and Attorneys General. See a report on the background and status of the New York Indians sub-

14. Deed of Conveyance from David Ogden to Robert Troup and others dated February 21, 1821, recorded in Liber One of Deeds at pp. 102–110, Cattaraugus County Clerk's Office, Little Valley, New York (N.Y.Leg.Doc. No. 51, 1889, pp. 172–181).

mitted to the Speaker of the House of Representatives by the Department of the Interior on January 4, 1954.[15] See also Dixon v. State, 4 Misc.2d 76, 155 N.Y.S.2d 723 and St. Regis Tribe of Mohawk Indians v. State, 4 Misc.2d 110, 158 N.Y.S.2d 540, reversed on other grounds at 5 A.D.2d 117, 168 N.Y.S.2d 894. Collateral support for this view is also found in the rules of law, basic in New York since the time of its inception, that original and ultimate property to all lands within the jurisdiction of the state resides in the people thereof (reflected today in New York Constitution, Art. I, Sec. 10); and that no sale of Indian lands may be made without legislative consent (N.Y.Const. Art. I, Sec. 13). When Section 1007, Public Authorities Law of New York State was amended, a statement from the floor during the debate contained a direct quote showing knowledge by the Legislature that plaintiff's lands were involved. In view of this, the Legislature must be presumed to have consented to the taking. Even if this were not so, there appears to be authority for such a taking, irrespective of legislative approval. See St. Regis Tribe of Mohawk Indians v. State, 5 A.D.2d 117, 168 N.Y.S.2d 894, at page 898–899.

As a result of the character of Indian title in New York, the provision of the Pickering Treaty which, if applicable, would apparently limit grantees of the Six Nations to "the people of the United States" (Art. 3), could not refer to the Federal Government only, since the Federal Government never possessed the fee or the pre-emptive right in New York Indian lands. Indeed, the Supreme Court, in The New York Indians, 5 Wall. 761, 72 U.S. 761, 18 L.Ed. 708, interpreted that treaty as meaning that the Indians could sell only to the party possessed of the right of pre-emption, although this had to be done with the consent of the government. The treaty of "Big Tree", which extinguished the Indians' original right to possession in the land in issue, was acquiesced in by the United States. For this reason, that treaty also complied with the requirements of the first "Indian Non-Intercourse Act" [16] (1 Stat. 137, 138), and also with the second "Non-Intercourse Act" [17] (1 Stat. 329, 330). Furthermore, the character of the title to Indian lands in New York explains the holding in Seneca Nation of Indians v. Christie, supra, that New York had the power to make treaties with New York Indians for the purchase of their lands; and the holding in United States v. Franklin County, D.C., 50 F.Supp. 152, that the absence of a United States Commissioner at the making of such a treaty would not invalidate it. The character of that title also affords the basis for the holding that Indians in New York are wards of the State, and that fee to their lands resides in the State, as found in Seneca Nation of Indians v. Christie, supra; Dixon v. State, supra, and other decisions. In People of State of New York ex rel. Ray v. Martin, 1946, 326 U.S. 496, at page 499, 66 S.Ct. 307, at page 308, 90 L.Ed. 261, the most recent decision of the Supreme Court on the subject of the peculiar status of the New York Indian, it was held that the power of Congress to regulate commerce with the Indian tribes, derived under the same clause of the Constitution with the power to regulate interstate commerce, is of a similar nature, the court saying, "In the absence of a limiting treaty obligation or Congressional enactment, each state had a right to exercise jurisdiction over Indian reservations within its boundaries." Finally, there are innumerable examples of the extinguishment of Indian title in New York, some involving plaintiff's land, in which the United States took no part.[18] The state has, for example, long exercised the power of eminent domain

15. Report entitled "Background Data on Indians of New York" transmitted by Assistant Secretary of the Interior Orme Lewis to the Speaker of the House of Representatives, January 4, 1954. Plaintiff's Exhibit 7.

16. Indian Non-Intercourse Act, July 22, 1790. 1 Stat. 137, 138.

17. Indian Non-Intercourse Act, March 1, 1793. 1 Stat. 329, 330.

18. Agreement between New York Tele-

over Indian lands for highway and related projects. Wadsworth v. Buffalo Hydraulic Ass'n, 15 Barb. 83.

■■ As a result of the foregoing, it is clear that the disposition of the pre-emptive rights by Massachusetts to Robert Morris was proper; that Morris' extinguishment of the original Indian right to possession conformed with applicable Federal law, that plaintiff does not now, and never did, possess that right in the lands in dispute. Whatever interest the United States has in the New York Indians is directed not to Indian lands as such, but to something more vague and general, such as their general welfare.[19] In any event, it is not directed to the land in dispute, which was given reservation status by the New York Legislature, not by the United States.

The character of the interest of the United States effectively refutes the contention by plaintiff's attorney that since the Bureau of Indian Affairs had to approve his contract with plaintiff,[20] that the Congress therefore intended to retain control over plaintiff's land. Control of the specific matter of attorneys' contracts is not at all consistent with the absence of exercise of federal control over New York Indian lands.

■ Plaintiff's land is unique among Indian lands in New York, having been purchased, rather than granted or ceded by the government. Plaintiff holds record title to the lands in dispute, but the effect of that title has not been determined. The act of the Legislature in 1821, after several petitions by plaintiff, permitted plaintiff to hold its land nationally and extended to it a tax-free status, and other protections constituting reservation status. It may be claimed that this had the effect of vesting the fee in the state in return for the favored status granted. Research reveals no previous decisions on either the ability of an Indian tribe to hold land in fee, if purchased, or the effect of giving purchased land reservation status. But that question need not be dealt with here. For it is clear that if the fee is in the state, it may be taken by the state. But if the fee is not in the state, then it is privately held. If privately held, the fee is subject to the power of eminent domain and just compensation for the taking, unless it falls within a category excluded by Federal law or the State Constitution. The plaintiff urges particularly Section 177 and Section 233 of Title 25 U.S.C.A., which was an amendment to the Indian Law becoming effec-

phone Company and Niagara Mohawk Power Corporation and Chief Harry Patterson, March 1, 1951. Defendant Power Authority Appendix, pp. 122a–123a.

Agreement between Niagara Mohawk Power Corporation and Harry Patterson, March 17, 1958. Defendant Power Authority Appendix, pp. 124a–125a.

19. Letter from Fred G. Aandahl, Assistant Secretary of the Interior to Henry Patterson, member of Council of Tuscarora Nation and owner by allotment of 500 acres of land declining under date of November 1, 1957 to aid the Tuscarora Nation in opposing the Authority's application then pending before the Federal Power Commission.

Order of Federal Power Commission— "As your reservation lands are under State jurisdiction, this department is not in a position to present your case for you." This sentence was quoted by the Federal Power Commission in its order issued March 21, 1958, which de-

nied the application of the Tuscarora Nation for a rehearing of its objection to the licensing of the Niagara project because the reservoir is to be located on part of its land.

Plaintiff's exhibit 10; Power Authority Appendix p. 149a. See also Report of Department of Interior, Plaintiff's exhibit 7 supra, and plaintiff's exhibits 9A, 9B and 9C.

20. Letter from Assistant Commissioner of the Bureau of Indian Affairs, Department of the Interior, to Messrs. Strasser, Spiegelberg, Fried and Frank, Attorneys for Plaintiff, dated May 12, 1958. Plaintiff's exhibit No. 8A.

Notice of approval of contract entered into by the Tuscarora Indian Nation and the law firm of Strasser, Spiegelberg, Fried and Frank, authorized by the Deputy Commissioner of the Bureau of Indian Affairs, Department of the Interior, dated April 17, 1958. Plaintiff's exhibit No. 8B.

tive in September, 1952, and which the plaintiff claims excludes the alienation of lands in reservations in New York State. The Public Authorities Law, Section 1007 of the State of New York, contemplates a right of eminent domain in the sovereign state as granted in Section 21 of the Federal Power Act, 16 U.S.C.A. Section 814. Moreover, the acquisition of property as taken by the State Power Authority is the method outlined in the State Highway Law of New York, Section 30. See, Lake Ontario Land Development etc. v. Federal Power Comm., 93 U.S.App.D.C. 351, 212 F.2d 227. Under the Federal Power Act, as held in State of Missouri ex rel. and to Use of Camden County Mo. v. Union Electric Light and Power Co., D.C., 42 F.2d 692, necessity for taking property under power of eminent domain is exclusively within the power of Congress to determine by direct enactment or delegation of its power to an office or board. Under this section, a licensee, such as the Power Authority of the State of New York, has a general power to take. See Burnett v. Central Nebraska, etc., 147 Neb. 458, 23 N.W.2d 661; United States v. Miller, 317 U.S. 369, 63 S.Ct. 276, 87 L.Ed. 336.

There is no constitutional requirement that the appropriation now involved be specifically authorized by an Act of Congress. The Federal law urged as applicable by plaintiff has been examined above and found to present no bar to the exercise of eminent domain. The State Constitution has been examined, and, far from presenting a bar to public condemnation, discloses an intent by the state to exercise exclusive control over Indian lands in New York.

In addition, Section 233 of Title 25 U.S.C.A. in its reference to the alienation of Indian lands in New York meant merely that the general law of New York relating to the alienation of land should not, as a result of Sec. 233, be construed to apply to Indian lands, but rather that the peculiar nature of such lands (i. e. a mere possessory right in the Indian Nations), should continue to be recognized. If the Congress had intended to

place an absolute restraint on the alienation of Indian lands in New York, or to assert an absolute paramount authority in the Congress over New York Indian lands, it would not have chosen so incongruous and unlikely a time and place to do so. If such a violent departure from the long history of dealing with and treating Indian lands had been intended, the Congress would surely not have done so in so casual and off-handed a manner. The parties have adduced nothing, either by way of legislative history or legal interpretation, to indicate that such was the intent of Congress. The plaintiff alleges that further acts on the part of the Power Authority, pursuant to the statutes of the State of New York, would, except for the intervention of this court, "interfere with the effective discharge of vital functions of the Federal Government, will frustrate the powers conferred by the Constitution upon the Congress of the United States, and are unlawful and will cause irreparable damage to plaintiff, for which it has no adequate remedy at law."

■ (1) *Jurisdiction*—While this court does not feel that a wholly federal question is raised here, nor that the usual jurisdictional limits of this court are met by the parties herein, this court has not been able to find any authorization for an Indian Tribe or Nation to institute a suit in state court seeking the relief sought here. Solely because plaintiff would be without the right to seek its present remedy if it were allowed to maintain this action, this court assumes jurisdiction of the action, and proceeds to a consideration on the merits. Sec. 5 N.Y. Indian Law; King v. Warner, Sup., 137 N.Y.S.2d 568; Bailey v. Miller, 208 Misc. 26, 143 N.Y.S.2d 122.

■ (2) *Three Judge Court*—Regardless of the pleadings and memoranda of the parties as to whether a constitutional question is presented, it is for the court to determine whether or not a claim of unconstitutionality is a substantial one. Patterson v. Hardin, D.C., 145 F. Supp. 299. The view of this court is that the question presented is merely one of

construction of a state statute as applied to this plaintiff. Having already determined that no substantial federal question is technically presented, and for the reasons set forth below under point 3, this court concludes that no substantial constitutional question is raised, and that defendant Power Authority's motion for a three judge court must be denied. See Wreiole v. Waterfront Commission of New York Harbor, D.C.N.Y.1955, 132 F.Supp. 166; Howard v. Ladner, D.C. Miss.1953, 116 F.Supp. 783, remanded for dismissal White v. Howard, 347 U.S. 910, 74 S.Ct. 476, 98 L.Ed. 1067.

(3) *Propriety of Taking*—As a result of the above analysis of the history and character of plaintiff's interest in the Tuscarora Reservation, there is no adequate reason why the taking by defendants of the land in dispute should not be confirmed. The motion for a permanent injunction must be, and is, denied. The temporary restraining order hereinbefore granted by Palmieri, D. J., and modified by Sugarman, D. J., each in the Southern District of New York, is dissolved. Plaintiff's motion that the temporary restraining order be continued pending appeal to the Circuit Court is denied. Plaintiff's motion that the affidavit of Henry S. Manley be stricken as an affidavit and considered by the court as an additional brief on behalf of defendants is granted.

■ (4) *As to Just Compensation*—This court adopts the reasoning of Lambaise, J., in St. Regis Tribe of Mohawk Indians v. State, 4 Misc.2d 110, 158 N.Y. S.2d 540, 548, wherein the court held that although an Indian tribe may not bring suit in New York except by statutory authority, Section 30 of the Highway Law "would be clearly unconstitutional where it makes no provision for compensation to those whose private property is to be taken for public use.

While payment need not precede the taking, the provision for compensation must not only pre-exist, but it must be so definite and certain as to leave nothing open to litigation except the title to the property taken and the amount of damages which the owner may recover. Litchfield v. Bond, 186 N.Y. 66, 74, 78 N.E. 719, 222; Sweet v. Rechel, 159 U.S. 380, 406, 16 S.Ct. 43, 51, 40 L.Ed. 188." Neither Sec. 30 of the Highway Law nor Sec. 1007 of the Public Authorities Law set forth any restriction or limitation "upon the legal status of the owner from whom the property is taken, and implicit therefor, if not explicit, therein, is the right of an owner to have his day in court to prove his title, or interest and to establish his damages." Though St. Regis Tribe of Mohawk Indians v. State, supra, was reversed by the Appellate Division, Third Department, at 5 A.D.2d 117, 168 N.Y.S.2d 894, the reversal appears to have been on other grounds. It is therefore the holding of this court that there is statutory authority for plaintiff herein to bring suit in the New York Court of Claims to determine the amount of just compensation for the taking herein, and that the Court of Claims is the proper forum for determining the question of compensation. The constitutional requirement of just compensation is met. A careful reading of the statute law, and the interpretation thereof by case law above cited, indicate that plaintiff has a right of action in the courts of the State of New York. Therefore, this court declines to accept jurisdiction of the question of compensation, or to impinge upon the jurisdiction of the New York courts, and leaves plaintiff to its state remedies in this respect. The complaint in this action is dismissed without costs. The above constitutes the findings of fact, conclusions of law and judgment of this court. The judgment is effective immediately. So ordered.